Ella Mae STARLING, Plaintiff,

v.

SEABOARD COAST LINE RAILROAD COMPANY, et al., Defendants.

Ralph K. BUIE, Plaintiff,

v.

GAF CORPORATION, et al., Defendants.

Robert E. STAPLETON, et al., Plaintiffs,

v.

OWENS–CORNING FIBERGLASS CORPORATION, et al., Defendants.

Civ. A. Nos. CV 281–109, CV 281–84 and CV 280–128.

United States District Court, S. D. Georgia, Brunswick Division.

Jan. 26, 1982.

---

Richard H. Middleton, Jr., Savannah, Ga., R. Jackson, B. Smith, Jr., Augusta, Fla., for plaintiff in all cases.

Ronald L. Motley, Barnwell, S. C., for plaintiff in Nos. 281–109 and 281–84.

Jesse W. Hill, Edward E. Dorsey, Sewell K. Loggins, Michael V. Elsberry, Atlanta, Ga., William C. Reed, Augusta, Ga., James E. Mahar, Jr., Gainesville, Ga., Patrick J. Rice, Neal W. Dickert, Augusta, Ga., Frederick F. Saunders, Jr., Mary E. Mann, John E. Talmadge, Atlanta, Ga., J. Douglas Stewart, George W. Brinson, Gainesville, Ga., J. Wayne Pierce, Henry E. Scrudder, Jr., Richard P. Schultz, Carr, Abney, Tabb & Schultz, Atlanta, Ga., Henry G. Garrard, III, Athens, Ga., Tommy T. Holland, Robert A. Barnaby, II, Malcolm McArthur, Albert H. Parnell, Atlanta, Ga., James M. Thomas, Bouhan, Williams & Levy, Savannah, Ga., Jeffrey Silberfeld, Garden City, N. Y., John T. Woodall, Savannah, Ga., William H. Whaley, Atlanta, Ga., Thomas Gray, Jr., Savannah, Ga., for defendants in all cases.

Peter K. Klintz, Atlanta, Ga., for defendants in No. 281–109.

Ann Bishop Conn, Atlanta, Ga., for defendants in Nos. 281–109 and 281–84.

Ashley Royal, Kent, Barrow & Royal, P. C., Savannah, Ga., for defendants in No. 281–84.

Charles B. Mikell, Jr., Savannah, Ga., Andrew T. Berry, Newark, N. J., Edgar A. Neely, Jr., Edgar A. Neely, III, and Richard K. Hines, V, H. Andrew Owen, Atlanta, Ga., William T. Daniel, Jr., Savannah, Ga., Williston C. White, Stephen L. Goldner, Atlanta, Ga., Paul W. Painter, Jr., R. Clay Ratterree, Karsman, Brooks, Painter & Callaway, P. C., Kenneth C. Etheridge,

Asst. U. S. Atty., Savannah, Ga., for defendants in Nos. 281–84 and 280–128.

William S. Davies, Jr., Nelson, Mullins, Grier & Scarborough, Columbia, S. C., Larry Hogan, Atlanta, Ga., James B. Wall, Augusta, Ga., Marc Z. Edell, Morristown, N. J., for defendants in No. 280–128 and for third party defendants in No. 280–128.

Oliver B. Dickins, Jr., Atlanta, Ga., Timothy Callaway, III, Savannah, Ga., for defendants in No. 280–128.

## MEMORANDUM OPINION AND ORDER

### ALAIMO, Chief Judge.

The above-captioned actions, along with *Finleyson v. Combustion Engineering, Inc., et al.*, CV 281–62 and *Beasley v. Shook & Fletcher Insulation Co., et al.*, CV 281–132 comprise the asbestosis cases currently pending in this division of the Southern District of Georgia. The complaints in these cases allege at least five theories of liability: negligence, strict liability, civil conspiracy, breach of an implied warranty, and, in the alternative, so called "market share liability." Additionally, in both the *Buie* and *Starling* cases the plaintiffs also charge fraud and an intentional tort. The cases are currently before this Court on the motions of various defendants to strike the "market share liability" and implied warranty counts, and, where pleaded, the fraud and intentional tort counts.

For the following reasons the Court decides to grant the motions for each of the challenged counts except the fraud charge, which is pleaded in Count five of the *Buie* and *Starling* cases. Where the successfully challenged counts are pleaded they are hereby ORDERED dismissed.[1]

DISCUSSION

I. Market Share Liability.

 The most provocative of the theories of liability alleged in these cases is market share or industrywide liability, and the question before this Court is whether the assertion of such a theory sounds a cognizable claim under Georgia law.[2] *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Neither the Georgia appellate courts nor the Georgia legislature has squarely addressed the issue; therefore this Court will make its determination as though it were sitting as a Georgia appellate court. *Stevens Industries, Inc. v. Maryland Casualty Co.,* 391 F.2d 411 (5th Cir.), *cert. denied,* 392 U.S. 926, 88 S.Ct. 2285, 20 L.Ed.2d 1386 (1968) (federal district court stands in shoes of state appellate courts when deciding novel questions of state law). The movants argue that the recognition of market share or industrywide liability would be an expansion of existing products liability law, and would be unconstitutional as violative of Georgia's Due Process Clause. The plaintiffs counter that the application of the theories to asbestosis cases would be a reasonable extension of Georgia's already adopted policy of alternative liability. Without deciding the constitutionality of these theories, the Court agrees with the movants that recognition of market share or industrywide liability would result in an unprecedented departure from traditional Georgia tort law. Furthermore, the Court believes that the legal and economic ramifications involved in moving towards insured compensation for asbestosis victims do not commend a judicial resolution to the problem. Deferring evaluation of the competing public policy considerations to the legislature would be consistent with an existing policy of judicial restraint in the products liability area. The

---

1. While the motions are before the Court as motions to strike under Rule 12(f), the parties have briefed the issues as whether the challenged counts state claims upon which relief can be granted. The Court has therefore treated these motions as equivalent to motions to dismiss under Rule 12(b)(6) and tested the motions under Rule 12(b)(6) standards. *See Asay*

*v. Hallmark Cards, Inc.,* 594 F.2d 692 (8th Cir. 1979).

2. The plaintiffs appear to consider these two theories synonymous. The Court thinks that the theories, while similar, are distinct, but reads the plaintiffs' pleadings as properly including the elements of both. The Court will therefore evaluate the legality of both theories.

Court therefore grants the defendants' motions and ORDERS dismissed the market share liability count in each of the pending asbestosis cases.

 Under traditional products liability law, the imposition of liability depends upon the plaintiff's proving that the defendant manufacturer made the product that caused the plaintiff's injury. *See Douglas v. Smith,* 578 F.2d 1169 (5th Cir. 1978) (applying Georgia law); *Annot.,* 51 A.L.R.3d 1344 (1973). Market share and industrywide liability are two approaches courts have adopted to aid plaintiffs in overcoming an inability to prove causation in products liability cases. *See* Comment, *Market Share Liability: An Answer to the DES Causation Problem,* 94 Harv.L.Rev. 668 (1980) [hereinafter *Harvard Comment*].

 Industrywide liability is loosely based on the concert of action theory of liability. "[T]he concert of action theory derives from a criminal law concept, aiding and abetting, and renders jointly and severally liable all who intentionally participate in an unlawful activity...." *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004, 1015 (D.S.C. 1981). *See* Restatement (Second) of Torts § 876 (1979). The common tortious activity is held to be the cause of the plaintiff's injury, and therefore all participants are held liable even if only one directly caused the harm. *Harvard Comment, supra,* at 670. Under industrywide liability, an industrywide standard of safety which is insufficient to protect product users "becomes itself the cause of plaintiff's injury, just as defendants' joint plan is the cause of injury ... [under the] concert of action plea." Comment, *DES and a Proposed Theory of Enterprise Liability,* 46 Fordham L.Rev. 963, 997 (1978) [hereinafter *Fordham Comment*]. Independent adherence to the standard by each industry member renders it a "contribut[or] to plaintiff's injury," and therefore a causative agent. *Fordham Comment, supra,* at 997. The theory was first applied in *Hall v. E. I. Du Pont De*

Nemours & Co., 345 F.Supp. 353 (E.D.N.Y. 1972) where the plaintiffs were children who were injured by exploding blasting caps and were unable to identify the specific manufacturer of the caps. The plaintiffs alleged that the defendants had "actual knowledge" of both the risks to children and the "feasible safety measures" which could control the risks, and that the defendants had "obtained this knowledge through a jointly-sponsored trade association." *Id.* at 375. The Court held that, if proved, the allegations showed that the defendants had joint, or industrywide control of the risks, and this created a duty to minimize them by preventing defects and providing adequate warnings. *Id.* at 371–378. Once the plaintiffs demonstrated a breach of this duty the burden of proof shifted to the defendants to show that their product could not have caused the injury; the plaintiffs did not have to show direct causation.

The *Hall* approach was refined by the *Fordham Comment, supra,* which discussed the theory in the context of actions resulting from exposure to the drug DES.[3] The comment author suggested that a plaintiff need not join all the possible manufacturers of the product which caused his injury.[4] Instead the theory would apply as long as the plaintiff joined those manufacturers that accounted for an amount substantially greater than 50% of the total market sales of the product. *Fordham Comment, supra,* at 972. Furthermore, the author argued that damages under industrywide liability could be apportioned among the defendants according to their respective market share percentages. *Fordham Comment, supra,* at 999, 1000.

 Market share liability, on the other hand, was not carved out of joint venture principles, but rather is a theory which eliminates proof of causation strictly for public policy reasons. The theory is an extension of the alternative liability principle, which was developed in *Summers v.*

3. "DES is a synthetic estrogen type drug once prescribed to prevent miscarriages." *Harvard Comment, supra,* at 668.

4. In *Hall* the plaintiffs joined all the domestic manufacturers of blasting caps.

*Tice,* 33 Cal.2d 80, 199 P.2d 1 (1948), and is now embodied in the Restatement (Second) of Torts § 433B (1965). The alternative liability rule holds that when independent and simultaneous acts of negligence are committed against a party by two or more tortfeasors, but only one act results in injury, the plaintiff will be relieved from proving causation if the proof is unavailable. The reason for the rule is "the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) of Torts § 433B, comment f, page 446, (1965).

Under alternative liability, however, all the possible wrongdoers responsible for the injury must be before the court, and the negligent acts must have been committed simultaneously. *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). Market share liability extends the alternative liability concept by eliminating the necessity of joining all possible tortfeasors, and the requirement of contemporaneous negligent acts.[5] *Sindell, supra.* It also discards joint and several damage liability and adopts the *Fordham Comment* proposal for *pro rata* apportionment based on the respective defendants' share of the market. *Sindell, supra,* 26 Cal.3d at 612, 613, 163 Cal. Rptr. at 145, 607 P.2d 924.

The market share theory was developed by the California Supreme Court in the controversial *Sindell* case, *supra.*[6] In *Sindell* the daughters of women who had injested the drug DES during pregnancy brought a class action against five manufacturers of the drug.[7] They alleged that their exposure to the drug *in utero* later led to cancer. They also alleged that the named defendants failed to adequately test the drug or warn their mothers of the hazards associated with its consumption. The plaintiffs were not, however, able to establish which particular DES manufacturer supplied the pills that caused their injury.[8] The *Sindell* court recognized that because of the possibility that none of the five defendants produced the injury-causing pills, "an undiluted *Summers* rationale was inappropriate." *Id.* at 611, 163 Cal.Rptr. at 149, 607 P.2d 924. The Court, however, found "forceful" public policy arguments in favor of granting the plaintiffs a cause of action.

"The most persuasive reason for finding plaintiff states a cause of action is that advanced in *Summers* : as between an innocent plaintiff and negligent defendants, the latter should bear the cost of injury.

. . . .

From a broader policy standpoint, defendants are better able to bear the cost of injury resulting from the manufacture of a defective product. As was said by Justice Trayner in *Escola* [*v. Coca Cola Bottling Co.,* 24 Cal.2d 453, 150 P.2d 436 (1944)] '[t]he cost of an injury and the loss of time or health may be an over-

---

5. There is also language in *Sindell* to suggest that the market share theory can apply under strict liability principles. That is, the plaintiffs would not have to show independent acts of negligence by the named defendants, but only injury caused by a defective product produced by one of the joined parties. This showing, along with proof that the defective product caused the injury, would be enough to create a *prima facie* case against the defendants. *Sindell, supra,* 26 Cal.3d at 611, 163 Cal.Rptr. at 144, 607 P.2d 924.

6. *See, e.g.,* Note, 60 Nebraska L.Rev. 432 (1981); Note 8 Pepperdine L.Rev. 1011 (1981); Comment, 38 Wash. & Lee.L.Rev. 139 (1981).

7. Two hundred manufacturers are estimated to have produced DES. *Sindell, supra,* 26 Cal.3d at 615, 163 Cal.Rptr. at 147, 607 P.2d 924.

8. DES was prescribed generically rather than by brand name, pharmacists "filled prescriptions from whatever brand ... happened to be in stock," and the disease did not manifest itself for ten or twelve years, thus resulting in lost prescriptions and pharmacy records. *Sindell supra,* 26 Cal.3d at 595, 163 Cal.Rptr. at 134, 607 P.2d 924.

whelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' [citations omitted] The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety."

26 Cal.3d at 610, 611, 163 Cal.Rptr. at 144, 607 P.2d 924.

The California Supreme Court went on to hold that if the plaintiffs "join[ed] in the action the manufacturers of a substantial share of the DES which [their] mother[s] might have taken," therefore creating a substantial likelihood that the injury-causing defendant was before the court, the plaintiffs would be relieved of the burden of proving causation. *Id.* at 612, 163 Cal. Rptr. at 145, 607 P.2d 924. The defendants would bear the burden of exculpation by having to demonstrate that they could not have made the substance that injured the plaintiff.

The plaintiffs in the cases *sub judice* have framed their pleadings to include both of these novel theories. They allege that they will not be able to identify at trial the manufacturer or manufacturers that produced the injury-causing asbestos, that they have joined in the case a substantial portion of the asbestos producers in the Southeast, and that industrywide standards for testing the safety of asbestos products and warning of the potential hazards of exposure were inadequate and caused the plaintiffs' injuries.

The Court believes that these theories have no basis in Georgia law. Contrary to the plaintiffs' contentions, Georgia has not embraced the concept of alternative liability, and thus, unlike the *Sindell* court, market share liability has no precursive sup-

port. The only case the plaintiffs cite as recognizing alternative liability is *Hood v. Evans*, 106 Ga.App. 360, 126 S.E.2d 898 (1962). However, *Hood* never considered the issue of alternative liability, but rather concert of action liability. The factual setting of *Hood* was an illegal drag race which resulted in a participant driver injuring an innocent bystander. The court extended liability to a non-driver who had signalled the start of the race. The court's holding rested on the concert of action idea—the starter was a participant in an unlawful joint enterprise that resulted in injury. In dictum the court concluded its opinion with a citation to an A.L.R. annotation that discussed alternative liability. *Id.* at 363, 126 S.E.2d 898. The citation was introduced with the signal "*see also.*" A citation to a background issue in a case is not support for the proposition that the issue has been squarely considered and answered.

Moreover, while *Hood* justified its holding under concert of action principles, the Court cannot accept the case as a basis for recognizing industrywide liability. The *Hood* rule has never been extended to negligent rather than illegal conduct. It has never been extended to corporate defendants. But most important, the legal context of the case had nothing to do with relaxing the plaintiff's burden of proving causation, and although industrywide liability is dressed in joint tort principles this elimination is precisely what that theory contemplates and what the plaintiffs are asking the Court to do in the cases at bar.

In *Hood* the plaintiff had to prove causation: he had to show there was an unlawful enterprise, each defendant participated in the enterprise, and as a result of the enterprise he was injured. But in industrywide liability there is no joint venture or enterprise—merely individual, independent acts similarly committed across an industrywide front, one or more of which causes injury. There is only consistency, not a consortium.[9]

9. The framework of the plaintiffs' count adheres to this view. The plaintiffs do not allege in their pleadings cooperative or collective actions by the defendants. Indeed, the only mention of collective action comes in a separate count, one which alleges a civil conspiracy. Moreover, it is not alleged that these defendants' acts in any way combined to produce a

Thus, under industrywide liability there is the anomalous result that inadequate industrywide safety standards are considered the cause of the plaintiff's injury, yet manufacturers adhering to the standards may escape liability by proving that their product could not have directly caused the injury. If the tortious adherence to the unsafe industrywide standard causes the injury, manufacturers should be liable regardless of whose identified product directly produced the harm. *See generally* Comment, *Industry-Wide Liability and Market Share Allocation of Damages*, 15 Ga.L.Rev. 423 (1980). But because the acts are independent there is no joint causation. Despite reasoning to the contrary, industrywide liability does shift the burden of proving causation. Industrywide liability cannot soundly be based on concert of action principles, and *Hood* is no authority for shifting the burden of proof in this case.

A review of Georgia case law on this matter reveals no instance where a court has shifted the burden of proving causation. Therefore, if this Court were to fashion a new theory of products liability, it would have to be based wholly on public policy grounds. The Court declines to do so for three reasons.

■ First, while the Court is not unmindful of the growing policy of favoring recovery by innocently injured plaintiffs who would not otherwise recover under traditional tort principles, the Court adopts the view expressed in *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (D.S.C.1981) that the industrywide or market share concept takes a quantum leap toward "render[ing] every manufacturer an insurer not only of the safety of its own products, but of all generically similar products made by others." *Id.* at 1017. Such a leap would be contrary to Georgia's products liability rule that a manufacturer is not an insurer of his products.

*Center Chemical Co. v. Parzini*, 234 Ga. 868, 218 S.E.2d 580 (1975).

Second, judicial policy decisions to expand culpability in products liability cases may result in opening a Pandora's box of undesirable economic and social effects. Among former asbestos manufacturers in particular, the continued ability to spread losses by insurance may be difficult, and the goal of risk distribution unachievable. *See generally* Parnell, `Industrywide Litigation— Where We've Been and Where We're Going*, 48 Ins. Counsel J. 296 (1981). The flexibility to fashion remedies for asbestos victims that take into account economic and social ramifications is found in the legislature. Importantly, it was the legislature and not the courts that adopted strict liability in Georgia, and strict liability is, in effect, also a theory that expands liability by reducing a plaintiff's burden of proof.[10] *See Ga.Code Ann.* § 105–106. The policy questions surrounding the adoption of such expansive theories as industrywide or market share liability are even more intricate than those in the case of strict liability. The Court does not think that a Georgia appellate court would therefore shift the resolution of such questions to the judicial branch.

Finally, allocation of damages under these novel theories raises serious questions of fairness, particularly in asbestosis cases. The theories argue that negligent manufacturers pay roughly the same amount in total damages whether liability is under the market share approach or under traditional tort theory. The manufacturer of say 20% of all asbestos products in a given market would either be 100% liable in 20% of all asbestosis actions in that given market (traditional approach), or 20% liable in 100% of all such asbestosis actions (market share approach). Yet such equivalents hinge on a correspondence between the total volume of asbestos produced and the injury caused.

single injury. *See Gilson v. Mitchell*, 233 Ga. 453, 211 S.E.2d 744 (1975) (tortfeasors jointly liable for individual acts of negligence against the plaintiff combining to create a single injury). The only set of facts that can reasonably be comprehended by the pleading is independent negligent acts consistent throughout the industry, some of which resulted in plaintiffs' injuries.

**10.** Proof of a defect being less burdensome than proof of negligence.

*See Harvard Comment, supra,* at 629. But asbestos products are not fungible commodities. The injuries caused by asbestos exposure are not restricted to asbestos products—other products, such as cigarettes, may have caused or contributed to the injury.[11] Additionally, products containing asbestos are not uniformly harmful—many products contain different degrees of asbestos. *Garcia v. Johns-Manville Sales Corp.,* 81–649–Civ–T–GC (M.D.Fla. Aug. 28, 1981). Thus "the total risk created by any manufacturer would be a function of both its share of the market and the relative harmfulness of its products"; but a company's market share could not be adjusted for the latter relation. *Harvard Comment, supra,* at 679. Neither could it be adjusted for the possible harmful effect of nonasbestos products. Also, asbestos manufacturers make different types of asbestos products and would have a different market share for each product. *See Garcia, supra.* A market that is composed of an amalgam of asbestos products might also yield market shares that are not accurate indications of the potential exposure to disease created by a particular product. In effect, market shares cannot be quantified relative to harm such that apportionment of damages would be proximate with fault.

For all these reasons the Court concludes that industrywide and market share liability should not be recognized in the cases at bar. The Court adds, however, that it does not consider its ruling overly burdensome. Courts have noted significant differences between the marketing and use of asbestos products and the manner in which DES pills were marketed so that perhaps only the exceptional plaintiff in asbestosis actions will be deprived of a remedy.[12] Asbestos products, unlike DES, are not generically marked but have brand names. *See Garcia, supra.* The plaintiffs or their decedents were not exposed *in utero* but at their places of employment. The employers who purchased the products, as opposed to corner pharmacies, were generally large scale institutions. Therefore, the likelihood that either the asbestos manufacturers or the purchasers have maintained invoice records denoting whose products were used at a specific work site is much greater.[13] Moreover, the plaintiff need not determinatively prove which producer's asbestos caused his injury. A *prima facie* case is shown if the plaintiff can prove that he was exposed to the defendant's products on at least one occasion. *See Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1094 (5th Cir. 1973), *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Such circumstantial evidence would be enough to allow a jury to find that the defendant was the cause of some injury, at least in the case of pulmonary asbestosis. *Id.*

Accordingly, the motions are GRANTED.

## II. Implied Warranty.

The second count the movants move to dismiss is the plaintiffs'. claim of breach of an implied warranty. Various defendants charge that recovery on the claim is prohibited because the asbestosis victims were employees of the purchasers of the injury-causing products, and therefore cannot prove the essential element of privity between the plaintiffs and the defendants. The plaintiffs impliedly admit that they would not be able to show privity, but

---

11. Asbestos exposure can result in various diseases. One is pulmonary asbestosis, a nonmalignant scarring of the lungs. Continuous exposure to asbestos causes increased tissue breakdown. A second disease is mesothelioma, a form of lung cancer that can be caused by a single exposure to asbestos. Both forms of the disease have a long latency period. *Dombroff v. Armstrong Cork Co.,* No. 79–14048 (Cir.Ct. Fla. Aug. 3, 1981). *See Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir. 1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

12. The Court accepts as true for the purposes of these motions the plaintiffs' assertion that they will be unable to identify the manufacturer of the product to which they were exposed.

13. Perhaps these factual differences were the reason a trial court in California recently refused to apply market share liability in an asbestosis case. *Aguilar v. Johns-Manville Corp.,* No. 400769 (San Diego Cty.Super.Ct.Cal. Sept. 8, 1981) (order without opinion).

"contend, however, that if the Georgia Supreme Court were again directly faced with that issue it would extend judicially the operation [of the implied warranty statute] to such persons as plaintiffs." [14]

This Court does not sit to reverse Georgia appellate courts on the substantive law of Georgia. *See Stevens Industries, supra.* Georgia courts are clear and unambiguous on this question. "*Ga.Code Ann.* § 105–106a requires privity to support an action for violation of a warranty, whether express or implied, except as provided in *Ga.Code Ann.* § 109A–2–318 (1979)." *Watkins v. Barber-Colman Co.*, 625 F.2d 714, 716 (5th Cir. 1980) (citations omitted). Section 109A–2–318 extends warranty protection to any person who is a member of the household of the buyer or is a guest in the home of the buyer if it is reasonable that that person will use the warranted product. This exception has been explicitly interpreted not to include employees of a purchaser. *Watkins, supra,* at 714; *Weaver v. Ralston Motor Hotel, Inc.*, 135 Ga.App. 536, 539, 218 S.E.2d 260 (1975). As such, employees of a purchaser simply do not have privity with the manufacturer and the plaintiffs' claims for breach of an implied warranty are hereby DISMISSED.

### III. Fraud and Intentional Tort.

The last of the claims currently before the Court involves the fourth and fifth causes of action in the *Buie* and *Starling* cases.[15] Certain defendants argue that these counts do not state separate causes of action, but merely reiterate in inflammatory prose the charge made in the plaintiffs' earlier pleading of civil conspiracy, a pleading not currently challenged. As a result, say these defendants, these counts can have no other effect than to prejudice the jury and they should be stricken. The plaintiffs, however, contend that they have stated a separate cause of action in each count: the fourth count sounding a cause in intentional tort and the fifth count a cause of action in fraud.

The Court agrees with the movants regarding the fourth cause of action and ORDERS this portion of the complaints dismissed. The allegations in the fourth cause are a repetition of those made in the plaintiffs' third cause of action: both claim that the defendants conspired to withhold information from the plaintiffs regarding the harmfulness of asbestos exposure, and as a result the plaintiffs willingly exposed themselves to asbestos and contracted asbestosis. Regardless of whether such a claim is a ground for relief, the duplicity in the pleading requires that the fourth cause of action be dismissed. The plaintiffs' contention that this count states a separate claim of intentional tort is unfounded. The label, intentional tort, is merely a general descriptive term for specific types of tortious conduct which share the common element that the actor intended to injure the object of his action. Prosser, *Law of Torts* § 7 (4th ed. 1971). It is a branch of tort law, not the name for a specific tort for which a remedy at law is provided. *Holland v. Sanfax Corp.*, 106 Ga.App. 1, 126 S.E.2d 442 (1962), which the plaintiffs contend recognized a cause of action for intentional tort, allowed a cause of action for the intentional torts of fraud and conspiracy. The plaintiffs' position has no merit and the motions are hereby GRANTED.

The fifth cause of action, however, does state a separate claim upon which relief can be granted. The basic elements in an action for fraud are: (1) false representations made by the defendant; (2) knowledge that the representations were false; (3) an intention to induce the plaintiff to act or refrain from action in reliance on the representations; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *City Dodge, Inc. v. Gardner*, 232 Ga. 766, 769 n.1, 208 S.E.2d 794 (1974). Moreover, the lack of privity of contract with the defendant does not pre-

---

14. Plaintiff's Reply Brief in Opposition to Defendant's Motion to Strike, CV 281–84, p. 6.

15. CV 281–84 and CV 281–109 respectively.

clude an action in fraud. *Georgia-Carolina Brick & Tile Co. v. Brown*, 153 Ga.App. 747, 748, 266 S.E.2d 531 (1980). Even "where [the] representations are made to the public at large, or to a particular class of persons," as long as they are given "with the intention of influencing any member of the public or of the class to whom they may be communicated, any one injured through the proper reliance thereon may secure redress." *Hines v. Wilson*, 164 Ga. 888, 889, 139 S.E. 802 (1927). *See Georgia-Carolina Brick, supra*, 153 Ga.App. at 748, 266 S.E.2d 531 (any real party in interest can bring fraud suit). In these cases the plaintiffs claim the asbestos manufacturers made false representations to insulation workers who used asbestos products regarding the dangers of asbestos exposure. The plaintiffs further allege that the misrepresentations were made with the intention of inducing insulation workers to continue to use asbestos products, and that as a result the workers rightfully relied on the misrepresentations and the plaintiffs suffered from the products. If the plaintiffs can show that the manufacturers of the particular product which caused their injuries participated in the conduct alleged above, they will have presented a claim for relief due to fraud. *See Holland v. Sanfax Corp.*, 106 Ga.App. 1, 126 S.E.2d 442 (1962) (fraud action allowed against product manufacturer for misrepresentation of harmfulness). The defendants' motions on this portion of the pleadings are hereby DENIED.

## CONCLUSION

In conclusion, this Court holds that in those asbestosis cases where industrywide or market share liability has been pleaded, such counts are hereby DISMISSED. The Court further holds that implied warranty liability does not state a claim under Georgia law in asbestosis cases and DISMISSES those counts where pleaded. Finally, the Court DISMISSES count four in the *Buie* and *Starling* cases, but DECLINES to DISMISS count five in those cases because it views that count as pleading an action for fraud upon which relief can be granted.