Antoinette J. VIGIOLTO, Executrix of the Estate of Christopher J. Vigiolto, Deceased and Antoinette J. Vigiolto, in her own right, Plaintiff,

v.

JOHNS–MANVILLE CORPORATION, a corporation; Johns-Manville Sales Corporation; Unarco Industries, Inc.; GAF Corporation; Raybestos-Manhattan; The Celotex Corporation, successor-in-interest to Philip Carey Mfg. Co.; Philip Carey Corporation, Briggs Mfg. Company and/or Panacon Corporation; Keene Building Products Corp.; Eagle Picher Industries Inc.; Forty-Eight Insulations, Inc.; and Owens-Illinois Inc., Defendants.

Civ. A. No. 81–1174

United States District Court, W.D. Pennsylvania.

Sept. 11, 1986.

Thomas W. Henderson, Henderson & Goldberg, Pittsburgh, Pa., for plaintiff.

Patrick R. Riley, Gerald Paris, James R. Hartline, Pittsburgh, Pa., James A. McGregor, Jr., Beaver, Pa., C. Leon Sherman, Meyer, Unkovic & Scott, Pittsburgh, Pa., for defendants.

## MEMORANDUM OPINION

DIAMOND, District Judge.

Plaintiff brought this action to recover damages arising out of the death of her husband, allegedly as a result of his exposure to asbestos containing products. Jurisdiction is based on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332. Presently before the court, are the defendants' motions for summary judgment. The motions challenge the validity and/or applicability to this suit of the plaintiff's several theories of liability.

### I. Introduction.

Christopher J. Vigiolto (the "decedent") served in the United States Navy from February, 1943 until June, 1945. During this time he was stationed on two ships, which were built and/or reconditioned by the Bureau of Ships, Department of the Navy. The plaintiff's complaint alleges that while decedent was in the naval service he was exposed to and inhaled asbestos dust and fibers [1] and that as a proximate result of this exposure he contracted malignant pleural mesothelioma, from which he died on January 6, 1981.

Although all pretrial procedures and discovery have been completed, the plaintiff concedes that she is unable to identify any manufacturer of the asbestos products to

---

1. In response to interrogatories, plaintiff stated that her husband was exposed to asbestos containing products when he was employed after his service in the Navy as a postal clerk and mail handler. However, plaintiff's complaint and subsequent pretrial statement claim exposure only during decedent's earlier military career.

which she contends decedent was exposed. At most, plaintiff can produce documents which indicate the manufacturers which *sought* to sell asbestos products to the Department of the Navy during the relevant time period.[2] Nevertheless, the plaintiff, asserting that she has named all, or substantially all, of the manufacturers who supplied asbestos to the United States Navy from 1943 through 1945, seeks to recover damages from the defendants under the so-called "enterprise", "industry-wide," or "market share" theories of liability.[3]

Defendants argue that they are entitled to summary judgment because the plaintiff cannot identify the particular product or its manufacturer which allegedly caused decedent's death. Contending that the principle of tort law requiring proof of "causation" as a prerequisite to the fixing of liability has been firmly engrafted onto the products liability law of Pennsylvania, the defendants contest the validity and/or applicability of the enterprise or market share theories of liability in this case. Indeed, the defendants assert that not only are these theories inapplicable in the instant factual context, but that they are contrary to traditional and sound tenets of tort law generally.

In a motion for summary judgment, the moving party must demonstrate that there exists no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), 28 U.S.C. In considering a motion for summary judgment, the court must determine whether any issues of material fact exist, assume the resolution of the existence of any such issue in favor of the non-movant, and determine whether the movant is entitled to judgment as a matter of law. *First Jersey Nat. Bank v. Dome Petroleum, LTD.*, 723 F.2d 335 (3d Cir.1983). *See, e.g., Hollinger v. Wagner Min. Equipment Co.*, 667 F.2d 402, 405 (3d Cir.1981).

■ In the absence of a definitive ruling on a question of substantive law from the highest court of the state whose law is applicable, a federal court sitting in a diversity action must predict how the highest state court ultimately would rule on that question of law. *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). The parties agree that the law of Pennsylvania is applicable in this suit. The Pennsylvania Supreme Court, however, never has ruled on the validity of any of the theories of liability advanced by the plaintiff, nor, therefore, has that court ruled on the applicability of any such theory of liability in the asbestos-litigation context. Accordingly, we must predict how that court will rule when those questions are before it.

## II. Applicable Law.

We begin with the proposition that in a tort action, as a general rule, proof that a

---

**2.** *See* plaintiff's brief and supplement brief in opposition to defendants' motion for summary judgment.

**3.** In *Prelick v. Johns-Manville Corp.*, 531 F.Supp. 96 (W.D.Pa.1982), this court struck paragraph twenty-two of the plaintiff's complaint which had alleged enterprise or industry-wide theories of liability. We concluded there that where the plaintiff was able to identify at least one manufacturer or supplier whose product allegedly caused plaintiff's injury, industry-wide liability or enterprise liability was inapplicable. The complaint in *Prelick* was a standard form used in asbestos cases by the same law firm which represents the plaintiff here. The instant complaint named certain asbestos manufacturers as defendants who allegedly had contributed asbestos dust and fibers to decedent's environment,

but, as indicated in the main text above, plaintiff cannot prove this allegation, and is therefore remitted to one of the alternative theories of liability which defendants' motion addresses. Although the plaintiff has not moved to amend her complaint to plead one of the alternative theories, paragraph 43 of the plaintiff's pretrial statement alleges that the "defendants are liable under the enterprise liability/market share liability/industry-wide liability theories of law." Since this merely constitutes a different theory of recovery and not a new cause of action and since the defendants have responded to these allegations, we do not believe that the defendants are prejudiced, and under the liberal amendment policy of Fed.R.Civ.P. 15(a) we will allow the plaintiff to amend her complaint accordingly.

specific defendant caused the plaintiff's harm is a prerequisite to that defendant's liability to the plaintiff. Prosser and Keeton, *On The Law of Torts*, § 41 (5th ed. 1984). However, in order to assist the plaintiff in a situation where he is unable to identify which of several tortfeasors caused the harm for which plaintiff seeks to recover damages, Pennsylvania and other jurisdictions have adopted a number of recognized exceptions to this rule.

*Alternative Liability*

■ The first of the modern so-called "alternative theories of liability" was created in *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). In *Summers*, two hunters simultaneously fired their guns at a bird, but plaintiff, a companion, was struck by a shot from one of the guns. Unable to prove which one of the hunters caused his resultant injuries, the plaintiff brought suit against both. The California Supreme Court held that despite the plaintiff's inability to determine which defendant actually caused the harm, each was jointly and severally liable to the plaintiff for his injuries. In so ruling, the court shifted the burden of proof to the defendants to establish which of the two caused the harm and held that in the absence of such proof both would be liable. The court reasoned that both defendants were wrongdoers, both had acted negligently, and that it was thus appropriate to place the onus on each defendant to "absolve himself if he [could]." *Id.*, p. 86, 199 P.2d p. 4.

The *Summers* "alternative liability" theory now is incorporated in § 433B(3) of the Restatement (Second) of Torts, which provides:

Where the conduct of two or more actors is tortuous, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

And in *Snoparsky v. Baer*, 439 Pa. 140, 266 A.2d 707 (1970), the Pennsylvania Supreme Court adopted § 433B(3) as the law of Pennsylvania. *See also, Sommers v.* *Hessler*, 227 Pa.Super. 41, 323 A.2d 17 (Pa. Super.1974).

In the case *sub judice*, defendants contend that § 433B(3) is inapplicable since it is unclear whether all possible parties have been joined as defendants. We agree. The *sine qua non* of § 433B(3) liability is proof that harm has been caused to plaintiff by *at least one* of the multiple actors sued by the plaintiff. The phrase in § 433B(3) that "it is proved that harm has been caused to the plaintiff *by only one* of" the two or more tortuous actors clearly implies this. Obviously then, if plaintiff cannot prove who caused his injuries and does not name as defendants *all* who *possibly could have*, plaintiff has not proved that *at least one* of the named defendants caused the harm. It follows, therefore, that in order to invoke § 433B(3) the plaintiff must name as defendants all who could have caused the complained of injury. *But see Erlich v. Abbott Laboratories, et al.*, 5 Phila. 249 (1981).

*Enterprise Liability*

■ Enterprise liability exists where it can be proved that plaintiff's injury was caused by at least one of a group of manufacturers of a particular product, where the precise offending manufacturer cannot be identified, and where the manufacturers collectively adhere to an unreasonable safety standard regarding the product.

Enterprise liability was recognized first in *Hall v. E.I. Du Pont De Nemours & Co., Inc.*, 345 F.Supp. 353 (E.D.N.Y.1972). *Hall*, and its companion case *Chance v. E.I. De Nemours & Co., Inc., id.*, arose out of eighteen separate incidents in which children were injured by blasting caps. In *Hall*, three groups of plaintiffs brought claims against two manufacturers of blasting caps. In each instance, one of the two manufacturers was identified as the producer of the injury-causing cap. The other, selected in effect at random from the industry, was joined on a theory of industry-wide responsibility for certain features of the cap's design. The court in *Hall* dismissed the second defendant because of the arbitrary manner in which that defendant

was selected and because there was no need to join it since plaintiff was able to identify the producer of the injury-causing cap. *Hall,* at 386.

In *Chance,* the plaintiffs were unable to identify any of the particular manufacturers of the injury-causing caps. As a result, they "joined substantially the entire blasting cap industry and its trade association as defendants ... [and sought] recovery on theories of joint liability." *Hall,* at 386.

The essence of the plaintiffs' theory was that the manufacturers had actual knowledge of the dangerousness of their products and that the manufacturers took inadequate precautions in light of the known risks of injury. Specifically, the plaintiffs asserted that the manufacturers' failure to print warnings on the individual blasting caps created an unreasonable risk of harm.

The district court permitted joinder of substantially the entire industry even though in each instance only one member of that industry had actually caused the harm. The court reasoned that the plaintiffs should be permitted to proceed under a theory of joint liability because the defendants, acting independently, followed industry-wide standards and customs concerning the safety of the blasting caps. The court stated:

> "Regardless of whether such evidence is sufficient to support an inference of tacit agreement, it is still relevant to the question of joint control of risk...."

*Hall,* at 374. The court also found that the defendants had delegated responsibility in safety investigation and design to a trade association and, thus, there was evidence of cooperation throughout the industry in manufacturing and designing the blasting caps. The court stated:

> The dynamics of market competition frequently result in explicit or implicit safety standards, codes, and practices which are widely adhered to in an entire industry. *See, e.g.,* 1 Frumer & Friedman, Products Liability § 5.04 (1970 rev.). Where such standards or practices exist, the industry operates as a collective unit in the double sense of stabilizing the

production costs of safety features and in establishing an industry-wide custom which influences, but does not conclusively determine the applicable standard of care. *See* Prosser, Law of Torts, § 33 at 166–68 (4th Ed.1971) (on relationship of industry custom to standard of care). As our decision in *Hall* below indicates, the existence of industry-wide standards or practices alone will not support, in all circumstances, the imposition of joint liability. But where, as here in *Chance,* individual defendant-manufacturers cannot be identified, the existence of industry-wide standards or practices could support a finding of joint control of risk and a shift of the burden of proving causation to the defendants. *See* discussion Rest.2d Torts § 433B (1965) below. *Hall,* at 374.

The court concluded that enterprise liability also was available to the plaintiffs on other grounds. Specifically, the court found that the defendants were in the best position to reduce the foreseeable costs of accidental detonations by redesigning the product. In addition, the court considered the inherent unfairness in denying recovery to the plaintiff simply because proof was unavailable that a particular defendant caused plaintiff's harm.

The court emphasized, however, that this reasoning was particularly applicable to industries composed of a small number of units. The court wrote:

> To establish that the explosives industry should be held jointly liable on enterprise liability grounds, plaintiffs, pursuant to their pleading, will have to demonstrate defendants' joint awareness of the risks at issue in this case and their joint capacity to reduce or affect those risks. By noting these requirements *we wish to emphasize their special applicability to industries composed of a small number of units. What would be fair and feasible with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentral-*

ized industry composed of thousands of small producers. [emphasis supplied]. *Hall,* at 378.

In the case *sub judice,* plaintiff attempts to justify an enterprise liability cause of action by asserting that the present action is virtually *identical* to *Hall, supra.* Plaintiff contends that there is a question of fact as to whether the defendants had actual knowledge of the dangerousness of asbestos and whether the defendants joined together to promulgate industry-wide safety standards despite the hazards of asbestos. And, as noted above, plaintiff's complaint asserts that the named defendants represent the substantial majority, if not all, of the asbestos manufacturers *who sought to supply the Navy* with asbestos insulation between February 13, 1943, and June 20, 1944. There is no allegation that these defendants represent a substantial portion of the industry.

The defendants, however, cite *Hall* in support of the proposition that because the asbestos industry is so extensive, it would be unreasonable to expect individual manufacturers to have knowledge of industry-wide safety hazards and the ability to control them. Defendants also argue that under the theory of enterprise liability each asbestos manufacturer could be liable for all of the plaintiff's injuries caused by asbestos by virtue of the manufacturers mere adherence to industry-wide standards of safety.

In *Hall,* six manufacturers comprised "substantially" the *entire* blasting cap industry in the nation. As we have noted above, the New York court specifically cautioned against the application of this theory to a case with a large number of defendant manufacturers. In the instant case, nowhere does the plaintiff allege that the named defendants represent substantially the entire asbestos industry which manufactured asbestos between 1943 and 1945. In addition, in *Hall* the plaintiff asserted that the blasting cap industry had delegated certain responsibilities relating to safety to its trade association and that consequently the risk embodied in blasting caps

was jointly controlled by the six manufacturers. No similar allegation is made here. These differences are significant and accordingly, we believe that the instant cause of action is an inappropriate one for the application of enterprise liability.

We note that our decision to reject enterprise liability as an alternative theory of liability under the facts of this case appears to be consistent with the law of Pennsylvania. In *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 495 A.2d 963 (1985), the Superior Court of Pennsylvania affirmed a lower court order which sustained preliminary objections to the plaintiff's complaint which had asserted a cause of action based on an enterprise liability theory. In *Cummins,* the plaintiff brought an action against twelve manufacturers of tire and rim parts to recover for injuries which plaintiff had sustained when a multi-piece tire and rim assembly exploded. As in the case before us, the plaintiff did not aver that the twelve manufacturers comprised substantially the *entire* tire and rim parts industry or that the defendant manufacturers had delegated functions relating to safety to their trade association. In those circumstances, the court held:

... [T]his cause of action has heretofore not been recognized by the courts of this Commonwealth as affording a basis for relief to an aggrieved plaintiff, and will not now be so adopted. [footnote omitted].

*Cummins,* 495 A.2d at 971.

In a footnote, the court then noted that industry-wide liability had been rejected by virtually every jurisdiction which had considered it. *See, Id.* at 971 n. 6. *See also, Burnside v. Abbott Laboratories,* 351 Pa. Super. 264, 505 A.2d 973 (Pa.Super.1985). There the court again rejected enterprise liability in an action by five women against pharmaceutical companies who manufactured diethylstilbestrol ("DES") and stated at page 979 that "[a] majority of those courts which have considered DES claims have held that a cause of action does not exist unless the plaintiff can identify the

manufacturer of the pills which caused injury." [citing cases].

Based on the foregoing, we believe that the theory of enterprise liability, as announced in *Hall*, is wholly dependent upon either the informed exercise of control over the uniform practices of a given industry by a small number of manufacturers or the delegation by them of safety functions to a trade association, and that a plaintiff who has failed to allege that either of these conditions exist will not be permitted to proceed under this theory. *See, Hall, supra.*

*Market-Share Liability*

■ Plaintiff also relies upon the so-called "Sindell" or "market-share" theory of liability. Under this concept, defendants are held liable for damages in proportion to their respective market share of the harm producing product. The theory takes its name from *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), which first applied it. In *Sindell*, the plaintiff sought to recover damages arising from cancer which she allegedly contracted as a result of her mother's use of diethylstilbesterol ("DES") while she was pregnant with the plaintiff. DES was a fungible product which the pharmaceutical companies manufactured from an identical formula, because of that and the long interval between the sale of the drug and the manifestation of the cancer, plaintiff was unable to identify any of the manufacturers of the DES which her mother had consumed.

After denying the applicability of the theories of "alternative liability," "concert of action" and "enterprise liability," the California Supreme Court embraced the so-called "market-share liability" theory, which the *Sindell* Court described as an extension of the alternative liability theory adopted in *Summers v. Tice, supra.* The "Sindell" and "Summers" theories are similar in that upon proof by the plaintiff of the existence of certain prerequisite circumstances each provides that the burden of proof shifts to the defendants to prove

that they did not cause the plaintiff's injury. However, two significant differences exist: (1) *Sindell* requires only that the named defendants represent a *substantial percentage* of the manufacturers who produced the hazardous product in the applicable market, whereas, as we stated earlier, the theory of alternative liability requires the joinder of *all defendants* who could have been responsible for the harm to the plaintiff; and (2) *Sindell* provides for damages on a *proportional* market-share liability basis, whereas, *Summers* contemplates joint and several liability.

The *Sindell* court recognized that proximate cause is an essential element in any negligence action, but reasoned that courts either can "adhere rigidly to prior doctrine, denying recovery to those injured by such products" or they can "fashion remedies to meet these changing needs," *Sindell*, 163 Cal.Rptr. at 144, 607 P.2d at 936, and opted for the adoption of the market-share liability theory in an attempt to respond to the changing needs of a modern industrialized society. The court was impressed by the reason given for the adaptation of the rules of causation and liability advanced in *Summers, supra:* "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury." *Sindell*, 163 Cal.Rptr. at 144, 607 P.2d at 936. These considerations are particularly appropriate in a situation similar to *Sindell:*

> Here, as in *Summers*, plaintiff is not at fault in failing to provide evidence of causation and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role in creating the unavailability of proof....
>
> Where, as here, all defendants produced a drug from an identical formula and the manufacturer of the DES which caused plaintiff's injuries cannot be identified through no fault of plaintiff, a modification of the rule of *Summers* is warranted.

*Sindell*, 163 Cal.Rptr. at 144, 607 P.2d at 936.

The California court ultimately fashioned a remedy for the injured plaintiff by finding it reasonable in the context of that case to shift the burden of proof to each defendant to demonstrate that it could not have caused the plaintiff's harm, or in the alternative, to hold each defendant liable for damages in proportion to its respective market share of the harm-producing product. The court required the plaintiff to join a "substantial" share of those manufacturers which manufactured the DES that plaintiff's mother *could* have taken. Once the plaintiff had joined a "substantial" share of the pharmaceutical companies which manufactured the drug, each defendant would be liable for a percentage of the damages equal to its share of the market, unless it could show that it *could not* have manufactured the drug which caused the plaintiff's injury. The court reasoned that "under this approach, each manufacturer's liability would approximate its responsibility for the injuries caused by its own products." *Sindell*, 163 Cal.Rptr. at 145, 607 P.2d at 937.

The defendants argue that market-share liability is inconsistent with traditional and sound tenets of Pennsylvania tort law. They emphasize the problems inherent in the *Sindell* court's failure to define what is meant by a "substantial" share of the relevant market and the potential for injustice resulting from the possibility that the manufacturer responsible for plaintiff's injuries might escape liability entirely because of the great disparity between the number of named defendants and the total number of producers. Defendants also assert that asbestos products, unlike the drug DES, are not fungible goods and that the distinctive packaging of the various asbestos products by the manufacturer makes it possible to identify the manufacturer of particular asbestos products.

The market share liability theory is novel to the courts of Pennsylvania. Our research indicates that only three reported decisions in Pennsylvania have addressed it.[4] In *Cummins v. Firestone Tire & Rubber Co., supra,* the plaintiff was unable to identify *any* offending product or particular manufacturer of a defective multi-piece tire and rim assembly which exploded and injured the plaintiff, but he asserted that he had sued those manufacturers which accounted for a "high percentage" of the multi-piece rim assemblies on the market. The superior court, however, declined to apply market share liability to the facts of the case since the possibility was "great that the actual wrongdoer will escape liability." *Cummins*, 475 A.2d at 972. In addition, the court wrote:

> Most significantly, appellant has failed to allege that all of the manufacturers have placed on the market fungible products which share identical defective qualities. The allegation that the multi-piece rim assemblies are "generically similar" falls far short of the standard employed in *Sindell* to extend traditional products liability principles.

*Cummins*, at 972.

Only one Pennsylvania court has adopted reasoning similar to *Sindell*. In *Erlich v. Abbott Laboratories, et al., supra,* plaintiff brought suit to recover damages for injuries plaintiff sustained as a result of her mother's use of DES but was unable to identify the manufacturer of the drug which allegedly caused plaintiff's harm. The court relied principally on comment h. to § 433B(3) of the Restatement (Second) of Torts (1977), see page 20, *infra,* in adopting a modification of § 433B(3) which was quite similar to the *Sindell* theory. The court stated:

> We feel that the instant case presents four elements which justify an extension of Section 433B(3) to cover cases in which fewer than all of the defendants have been joined. . . .

4. In *Burnside v. Abbott Laboratories, supra,* the superior court found it unnecessary, under the facts of that case, to consider the merits of a "market share alternative liability" concept

adopted by the Supreme Court of Washington in *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 590, 689 P.2d 368, 375 (1984).

First, the Plaintiff is unable to identify which of the defendants manufactured the product which allegedly caused her injuries, and that inability is through no fault of the Plaintiff....

Second, although contested, it is assumed for present purposes that those manufacturers who produced substantially all of the allegedly defective product which was marketed in the relevant area at that time have been joined as defendants....

Third, Plaintiff has alleged that all of the defendants are tortfeasors in the sense that all of them engaged in the same wrongful conduct of placing an allegedly defective product on the market without adequate warning of its dangers....

Fourth, Plaintiff alleges all of the products produced are identical and all share the same defective qualities.

*Erlich,* at 264–267.

In rationalizing the extension of § 433B(3), the court placed particular emphasis on comment h. of that section, which the court found to be sufficient reason to modify the traditional application of § 433B(3) to include situations where less than all of the possible defendants were before the court. Section 433B(3), comment h. states:

The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially the same character, creating substantially the same risk of harm, on the part of each actor. It is possible that cases may arise in which some modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant, or because of the effect of lapse of time, or because of substantial differences in the character of the conduct of the actors or the risks which they have created. *Since such cases have not arisen, and the situations which might arise are difficult to forecast,* no attempt is made to deal with such problems in this Section. *The rule stated in Subsection (3) is not intended to preclude possible modification if such situations call for it.* [emphasis supplied].

Although a market share liability modification is yet to be tested in the Commonwealth of Pennsylvania, we believe that in an appropriate case such a modification would be accepted by the Pennsylvania Supreme Court. Not only does comment h. for § 433B(3) provide for such a modification, but Pennsylvania case law also indicates that such a modification is desirable. We cited earlier two cases which dealt with § 433B(3), *Snoparsky v. Baer, supra,* and *Sommers v. Hessler, supra,* although neither case addressed the issue of whether it was necessary to have all potential tortfeasors before the court.

Also, we note Judge, now Chief Judge, Aldisert's comments in *Quinones v. United States,* 492 F.2d 1269 (3d Cir.1974), on the development of tort law in Pennsylvania:

In recent years we have witnessed rapid, if not revolutionary, development in judge-made tort law by Pennsylvania courts. Some of the more dramatic changes in the law of torts made by Pennsylvania courts in recent years are set forth in the margin. *It will be noted that in each of these developments the Pennsylvania court was expanding and not contracting liability of defendants increasing recoveries for plaintiffs.* [emphasis supplied, footnote omitted].

*Quinones,* at 1278–1279.

In view of the foregoing, we believe that it is fair to conclude as we do that when faced with an appropriate factual situation, the Pennsylvania Supreme Court will expand existing law and will recognize the market share liability theory as an alternative to traditional bases for establishing liability in personal injury suits.

This does not end our task, however, for we also must predict whether the Pennsyl-

vania Supreme Court will apply the market share liability theory in the *context of asbestos litigation*. After considering this issue, we conclude that the Pennsylvania Supreme Court will rule that market share liability is an inappropriate theory of relief for one seeking to recover damages for injuries sustained as a result of exposure to an asbestos-containing product.

The factor that distinguishes asbestos litigation from actions such as the one before the *Sindell* court is the harm producing product itself. *Celotex Corp. v. Copeland*, 471 So.2d 533 (Fla.1985), is an "asbestos case" in which the Supreme Court of Florida reversed a lower court decision [5] which had allowed the plaintiff to proceed under a market share theory. Justice Overton, speaking for the Court, offered compelling reasons why an understanding of the essential characteristics of the asbestos litigation and how they are to be distinguished from those in DES cases is crucial in determining whether to apply a market share liability theory in asbestos-injury cases: [6]

> In addition, it is important to note there are inherent differences between asbestos products and the drug DES, for which the market share theory was developed, which further make the market share theory extremely difficult to apply in asbestos-injury cases. DES was produced by hundreds of companies *pursuant to one formula*. As a result, all DES had identical physical properties and chemical compositions and, consequently, all DES prescribed to pregnant women created the same risk of harm to the women's female offspring. *See Sindell; see generally* Phillips, *Asbestos Litigation: The Test of the Tort System*, 36 Ark.L.Rev. 344 (1983); Scott, *Products Liability*, 1982 Ann.Surv. of Am.L. 709, 709–720 (1982); Note, *Market Share Lia-*

*bility: An Answer to the DES Causation Problem*, 94 Harv.L.Rev. 668 (1981).

> Asbestos products, on the other hand, have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others. *See generally* Locks, *Asbestos-Related Disease Litigation: Can the Beast be Tamed?*, 28 Vill.L.Rev. 1184 (1982–1983); Note, *Issues in Asbestos Litigation*, 34 Hastings L.J. 871, 889–95 (1983); Comment, *An Examination of Recurring Issues in Asbestos Litigation*, 46 Alb.L. Rev. 1307, 1325–29 (1982). This divergence is caused by a combination of factors, including: the specific type of asbestos fiber incorporated into the product; the physical properties of the product itself; the percentage of asbestos used in the product. There are six different asbestos silicates used in industrial applications and each presents a distinct degree of toxicity in accordance with the shape and the aerodynamics of the individual fibers. Further, it has been established that the geographical origin of the mineral can affect the substance's harmful affects. A product's toxicity is also related to whether the product is in the form of a solid block or a loosely packed insulating blanket and to the amount of dust a product generates. The product's form determines the ability of the asbestos fibers to become airborne and, hence, to be inhaled or ingested. The greater the product's susceptibility to produce airborne fibers, the greater the product's potential to produce disease. Finally, those products with high concentrations of asbestos fibers have corresponding high potentials for inducing asbestos-related injuries.

*Celotex*, at pp. 537–538.

Other courts which have addressed the appropriateness of imposing market share

---

**5.** *Copeland v. Celotex Corp.*, 447 So.2d 908 (Fla.3d DCA 1984).

**6.** Justice Overton's reasoning is persuasive notwithstanding the fact that the court's holding in *Copeland* was based principally upon the fact that the plaintiff was able to identify many of the manufacturers of the products to which he

was exposed. *See also, Prelick v. Johns-Manville Corp.*, 531 F.Supp. 96 (W.D.Pa.1982), where we held that plaintiff's ability to identify at least one defendant who allegedly caused plaintiff's injury precluded the use of the market share liability theory.

liability upon asbestos manufacturers offer additional reasons why this theory is unsuited in a context such as the one which is before the court. In *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480 (11th Cir.1985), the Eleventh Circuit found significant policy reasons for refusing to impose market share liability:

> First, elimination of a causation requirement would render every manufacturer an insurer not only of its own products, but also of all generically similar products manufactured by its competitors. [Citing *Starling v. Seaboard Coast Line Railroad Co.,* 533 F.Supp. 183, 190 (S.D. Ga.1982) ]. Second, expanding culpability of asbestos manufacturers could reduce the ability to spread losses by insurance and otherwise distribute risk. *Id.* Third, application of such a novel theory of causation would raise serious questions of fairness due to the fact that different manufacturers' asbestos products differ in degrees of harmfulness. *Id.* at 191. Thus, even if this Court were not bound as it is by Georgia law to require proof of exposure to a particular defendant's products to establish proximate cause, significant policy reasons favor retention of proximate cause as an essential element of a cause of action in asbestos litigation.

*Blackston,* at 1483.

And in *In re Related Asbestos Cases,* 543 F.Supp. 1152 (N.D.Cal.1982), the court found that where asbestos was the product in issue, numerous factors would make it "exceedingly difficult to ascertain an accurate division of liability along market share lines." *Asbestos Cases* at 1158. The court, in addition to recognizing that asbestos, unlike DES, was manufactured in several varieties and used in various quantities by defendants in their products, cautioned that "defining the relevant product and geographic markets would be an extremely complex task due to the numerous uses to which asbestos is put, and to the fact that some of the products to which the plaintiffs were exposed were undoubtedly purchased out of state sometime prior to the plaintiffs' exposure." *Asbestos Cases* at 1158.

In addition to the foregoing, the use of the market share liability theory requires a determination of what constitutes a "substantial share of the market". The *Sindell* court failed to define the term "substantial share"; consequently, this has given rise to a host of suggestions. The law review article relied upon by the *Sindell* court suggested that 75 to 80 per cent of the market must be joined,[7] and a California trial court interpreting *Sindell* held that a "substantial share" of the market is a minimum of 51% of the relevant market, but that the percentage may be increased upon an appropriate showing in a particular case. *Den Das v. Boyle Drug Co.,* No. 732–75 (Cal.Super.Ct. Ventor County October 1, 1984). Confronted with the uncertainty as to what constitutes a "substantial share", the Supreme Court of Florida in *Celotex Corp. v. Copeland, supra,* commented:

> This would require a determination of what companies produced the injurious products to which a party could have been exposed, when they produced the products, and where they were marketed. Further, as noted above, because the various asbestos products have different toxicities, the courts would have to determine how to apportion liability for the differing harmful effects of the different products.

*Celotex Corp.,* at 538.

That the reasons for not applying market share liability in asbestos-injury suits are compelling is reflected in the number of courts which have refused to apply that theory in asbestos-injury cases. *See* cases cited in *Celotex Corp. v. Copeland, supra,* at 538–539.

For the reasons stated above, we believe that the Pennsylvania Supreme Court, if presented with a similar issue, would find

---

**7.** *See Comment, DES & A Proposed Theory of Enterprise Liability,* 46 Fordham L.Rev. 963 (1978).

that asbestos litigation is an inappropriate context in which to extend the market share theory of liability; accordingly, defendants' motions for summary judgment will be granted.