**Shelley A. McCORMACK, Plaintiff,**

v.

**ABBOTT LABORATORIES et al., Defendants.**

**Civ. A. No. 76–4564–G.**

United States District Court, D. Massachusetts.

Sept. 30, 1985.

---

Peter N. Munsing, Edward M. Swartz, Swartz & Swartz, Boston, Mass., for plaintiff.

William A. McCormack, S. Elaine McChesney, Anne J. Dubitzky, Bingham, Dana & Gould, Boston, Mass., for Upjohn Co.

Phillip M. Davis, Elizabeth M. Fahey, Morrison, Mahoney & Miller, Boston, Mass., for Dart Industries, Inc.

Walter G. Murphy, Murphy & Mitchell, Boston, Mass., for Merck & Co., Inc.

David W. Rosenberg, Mark C. Hanson, Hill & Barlow, Boston, Mass., for Abbott Laboratories.

Marshall Simonds, Don M. Kennedy, Loretta M. Smith, Goodwin, Procter & Hoar, Boston, Mass., for Eli Lilly & Co.

Samuel Adams, Joseph J. Leghorn, Christopher E. Nolin, Frances E. Balin, Warner & Stackpole, Boston, Mass., for E.R. Squibb & Sons.

## MEMORANDUM AND ORDERS ON MOTIONS TO DISMISS AND MOTIONS FOR SUMMARY JUDGMENT

GARRITY, District Judge.

### I. DEFENDANTS' MOTIONS TO DISMISS

Defendants Eli Lilly and Company, E.R. Squibb & Sons, Inc., and Merck & Company, Inc. have filed motions to dismiss plaintiff's second amended complaint which arises out of the alleged ingestion by plaintiff's mother of diethylstilbestrol ("DES") or DES-related compounds or congenors during the pregnancy which resulted in plaintiff's birth on April 27, 1955. Plaintiff alleges that on or about April, 1974, she developed vaginal adenosis, pre-cancerous lesions in the vagina, as a direct and proximate result of her mother's ingestion of DES in 1954 and 1955. According to the complaint, the defendant drug companies[1] negligently designed, manufactured and distributed the drug, failed adequately to test or inspect the drug, failed adequately to warn physicians and the general public of health risks of which the defendants knew or should have known, and negligently misrepresented to the public that the drugs were safe and effective for use by pregnant women in the prevention of miscarriage. The complaint also contains claims sounding in breach of express and implied warranty and strict liability. Plaintiff seeks to impose liability upon the defendants equally or in proportion to their share of the relevant market.

By way of procedural history, plaintiff's case was originally consolidated with the case of *Payton v. Abbott Laboratories*, Civil Action No. 76–1514–S. A class was certified and plaintiff opted to become a member of the class. On December 6, 1983, Judge Skinner decertified the class and plaintiff now prosecutes her action individually. It should be noted, however, that all rulings of substantive law made in *Payton* between class certification and decertification are binding on plaintiff as a class member and may not be relitigated in the instant case. Order on Motion to Decertify the Class, Civil Action No. 76–1514–S, December 6, 1983 (Skinner, J.).

After hearing and consideration of the briefs, affidavits, and exhibits submitted by the parties, the court grants defendants' motion in part and denies it in part. With

1. The complaint names 6 drug companies as defendants and alleges that these 6 companies are responsible for a substantial share of the DES distributed in Eastern Massachusetts between July, 1974 and April, 1975. The court presumes plaintiff intended 1954 and 1955 as the relevant dates.

respect to plaintiff's claim of strict liability, defendants' motion to dismiss is allowed. However, the court denies the motion to dismiss plaintiff's claims of negligence and breach of warranty.

### A. *Strict Liability* :

■ Plaintiff charges defendants with placing an inherently unsafe and unreasonably dangerous product into the stream of commerce and seeks to impose on the defendants strict liability in tort. Defendants assert that plaintiff's claim is barred by a prior judgment entered in the *Payton* case prior to decertification of the plaintiff class. The court agrees.

The *Payton* defendants filed motions for summary judgment on the issue of strict liability. The motions were granted and judgment was entered on May 16, 1983 "against all named plaintiffs and against all members of the plaintiff class on all claims of strict liability." *Payton v. Abbott Laboratories*, Slip Opinion (1983) (Skinner, J.). Decertification did not occur until December, 1983. Plaintiff concedes that she is bound by all rulings of substantive law made in the *Payton* case prior to December, 1983. Accordingly, plaintiff's claim of strict liability in tort is precluded by the doctrine of res judicata and hereby is dismissed.

### B. *Breach of Warranty* :

Plaintiff brings claims of breach of express and implied warranties made by defendants that their drugs containing DES were safe, merchantable and fit for the purpose for which they were intended. Defendants seek to have the breach of warranty claims dismissed on the ground that the transactions giving rise to plaintiff's claims are governed by the Uniform Sales Act, which provided that a party bringing a breach of warranty claim had to establish privity of contract with the defendant. Massachusetts warranty law is currently modeled after the Uniform Commercial Code, which dispenses with the privity requirement. M.G.L. c. 106, §§ 2–314 to 2–318.

■ Defendants' argument has already been advanced and rejected by the court in *Payton v. Abbott Laboratories*, D.Mass., 1982, 551 F.Supp. 245, 246. In that case, the court held that a cause of action for breach of warranty is available under Massachusetts law to any plaintiff whose physical symptoms first occurred after the effective date of the 1973 amendment of M.G.L. c. 106, § 2–318, namely December 16, 1973. Defendants do not dispute the fact that plaintiff's physical symptoms first occurred in April, 1975. Accordingly, plaintiff's claims of breach of warranty state valid causes of action under Massachusetts law and defendants' motion to dismiss such claims must be denied.

### C. *Market-Share Liability* :

Turning to the principal issues raised by the defendants' motions, plaintiff seeks to impose liability on the defendants under a "market share" theory in order to bypass the traditional threshold requirement of any products liability action—identification of the injury-causing product and its manufacturer.[2] It is undisputed that plaintiff will not be able to meet the identification requirement. Defendants seek to have plaintiff's market-share claim dismissed on two grounds: first, Massachusetts law does not recognize a cause of action under a market share theory; and second, even if such a cause of action exists, plaintiff has failed to plead it properly by not alleging that she exercised due diligence in attempting to identify the manufacturer of the drug ingested by her mother and that, through no fault of her own, she was unable to do so.

In order to evaluate the contentions of the parties, the court must review the theory of market-share liability as it has developed in the jurisprudence of Massachusetts and other states in the country.

---

**2.** In *Payton v. Abbott Labs,* D.Mass., 1982, 551 F.Supp. 245, the court granted defendants' motions for summary judgment on all theories of joint and several liability. Consequently, plaintiff does not advance, and the court does not consider alternative liability as a theory of recovery.

1. *The Background of Market-Share Liability:*

In *Payton v. Abbott Laboratories*, 1982, 386 Mass. 540, 437 N.E.2d 171, Judge Skinner certified a question to the Supreme Judicial Court of Massachusetts: "whether manufacturers could be held liable to a plaintiff for DES-related injury when neither the plaintiff nor defendants could identify which manufacturer's DES was ingested by plaintiff's mother." The court declined to answer the question in the form stated. However, it did set forth its general views on the theory of market-share liability. The court stated that a theory which would permit a plaintiff to recover 100% of her losses from the manufacturers she has chosen to sue would create the risk of holding the named defendants liable in negligence for more harm than they caused. Secondly, a theory which would prohibit exculpatory proof, that is, proof by particular defendants that the DES they marketed could not have been ingested by a particular plaintiff's mother, would practically ensure that defendants innocent of wrongdoing to a particular plaintiff would be held liable to her. *Id.* at 573, 437 N.E.2d 171. The court stated that the identification requirement reduces the risk of holding innocent defendants liable or of punishing guilty defendants for more harm than they have caused.

The Supreme Judicial Court, however, did not reject outright a market-share theory. In fact, the court stated that on an adequate record, it might recognize "some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant time period." *Id.* at 574, 437 N.E.2d 171.

The emergence of a market-share theory of liability in American jurisprudence stems from the recognition by several courts that the field of products liability has been changed drastically with the advent of mass production of fungible goods and complex marketing methods. Consumers may be harmed by a product not traceable to a specific producer. Clearly, the traditional tests of liability are insufficient to govern the obligations of manufacturer to consumer in such situations, and some adaptation of the rules of causation and liability seems appropriate.

Lack of identification evidence in DES cases is rarely attributable to any fault on the part of the plaintiff. Rather, it results from the fact that DES was, for the most part, produced in a "generic" form which lacked any identifying markings. DES was a fungible drug produced by as many as 300 drug companies from a chemically identical formula. Secondly, courts have suggested that pharmacies and drug companies have contributed to the dearth of identification evidence by not keeping or not being able to locate pertinent records. Lastly, the very fact that DES is a drug whose effects are delayed for many years has played a significant role in the unavailability of proof. *See, e.g., Sindell v. Abbott Laboratories*, 1980, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924; *Martin v. Abbott Laboratories*, 1984, 102 Wash.2d 581, 689 P.2d 368.

Additionally, one of the functions of the identification requirement—separating wrongdoers from innocent actors—is of minor importance in the situation before this court. By producing and marketing an allegedly defective drug, all the defendants contributed to the risk of injury to the public and consequently, the risk of injury to individual plaintiffs. Under the market-share theory, a plaintiff must still prove that the defendants were negligent before the court may proceed to apportion damages on the basis of market share. Thus, none of the defendants can be considered truly innocent actors. Although the defendants may not have caused the actual injury of a given plaintiff, each may be shown to share, in some measure, a degree of culpability in producing and marketing DES. Furthermore, the court, while recognizing that the identification requirement also serves to protect defendants from being held liable for more harm than they have caused, believes that a market-share theory of liability, if properly fashioned,

will not subject a particular defendant to liability for more harm than it statistically could have caused in the relevant market.

Finally, the magnitude of the physical and psychological injuries which are at issue in DES cases counsels toward permitting a remedy under some form of a market-share theory of liability. As between the injured plaintiff and the possibly responsible drug company, the latter is in a better position to absorb the cost of the injury. The company can insure itself against liability, absorb the damage award, or distribute it among the public as a cost of doing business, thereby spreading the cost over all consumers. In many cases, the only alternative will be to place the burden solely on the injured plaintiff. Comment, "Market Share Liability: An Answer to the DES Causation Problem," 94 Harv.L.Rev. 668 (1981).

Other jurisdictions have already moved toward adoption of some form of market-share liability. In *Sindell v. Abbott Laboratories*, 1980, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, cert. denied, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140, the Supreme Court of California adopted a market-share theory under which a plaintiff need only name enough manufacturers to represent a "substantial share" of the market. Potentially, each defendant is liable only for the proportion of the judgment represented by its share of the market. *Id.*, 607 P.2d at 937. Theoretically, then, the extent of a defendant's liability approximates the amount of harm such defendant has caused in the market. South Dakota and Washington also recognize the market-share theory. *See, McElhaney v. Eli Lilly & Co.*, D.S.D.1983, 564 F.Supp. 265; *Martin v. Abbott Laboratories*, 1984, 102 Wash.2d 581, 689 P.2d 368. Other jurisdictions, while not adopting a market-share theory per se, have modified the traditional alternative liability theory originally developed in *Summers v. Tice*, 1948, 33 Cal.2d 80, 199 P.2d 1, to accommodate the unique situation of DES litigation. *See*, e.g., *Abel v. Eli Lilly & Co.*, 1984, 418 Mich. 311, 343

N.W.2d 164, *Collins v. Eli Lilly & Co.*, 1984, 116 Wis.2d 166, 342 N.W.2d 37.

Upon review of the case law concerning market-share liability, the court believes that the theory developed by the Washington Supreme Court in *Martin* offers the most useful framework for fashioning a market-share theory of liability in Massachusetts consistent with the guidelines articulated by the Massachusetts Supreme Judicial Court in *Payton*.

### 2. *Market-Share Liability in Massachusetts*:

■ Accordingly, the court holds that a plaintiff who can not meet the traditional identification requirement may avail herself of a market-share theory of liability by alleging the following elements: (a) that plaintiff's mother ingested DES during the pregnancy which resulted in plaintiff's birth; (b) that DES caused plaintiff's subsequent injuries; (c) that the defendant or defendants produced or marketed the type of DES taken by plaintiff's mother; and (d) that the defendant or defendants acted negligently in producing or marketing the DES. Plaintiff must prove each of these elements by a preponderance of the evidence. Note well: plaintiff need not allege or prove that a defendant produced or marketed the particular DES that caused her subsequent injuries. Plaintiff must only establish that a defendant produced or marketed the type of DES, as distinguished by color, shape, size or markings, ingested by plaintiff's mother.

Individual defendants may exculpate themselves from liability by proving by a preponderance of the evidence [3] that they did not produce or market the particular type of DES taken by plaintiff's mother; or that they did not market DES in the relevant geographic market area; or that they did not distribute the drug during the time period of plaintiff's mother's pregnancy.

■ Defendants who are unable to establish that the DES they produced or marketed could not have been ingested by

---

**3.** It will, of course, be plaintiff's burden to prove    negligent manufacture or marketing.

plaintiff's mother will become part of the DES market as narrowed and defined on a case-by-case basis by the specificity of the evidence as to geographic market area, time of ingestion, and physical characteristics of the subject DES. The court follows the approach taken by the court in *Martin v. Abbott Laboratories,* 1984, 102 Wash.2d 581, 689 P.2d 368, for apportioning liability among remaining defendants. Such defendants are presumed initially to have equal shares of the market. However, defendants may rebut this presumption by establishing by a preponderance of the evidence their individual market share of DES in the plaintiff's particular geographic market during the time period in question. Upon proof of an actual market share, a defendant will only be liable for the portion of the total judgment represented by such share. Of course, other defendants who fail to prove an actual market share will be liable equally for the remaining market.[4] On the other hand, where all defendants successfully establish a reduced actual market share, the portion of the judgment representing the remaining unclaimed share of the market may not be recovered by the plaintiff.[5] The rationale is that unnamed defendants are responsible for the remaining DES distributed in the relevant market and the named defendants should not be held to answer for the negligence of others. Defendants raise several arguments against adoption of such a market-share theory of liability and the court will address them separately.

First, defendants contend that apportionment of liability on this basis violates the letter and spirit of the *Payton* decision, where the Supreme Judicial Court expressed concern about protecting tortfeasors from liability exceeding their responsibility. However, under the market-share theory set forth in this memorandum of decision, disproportion between potential liability and actual responsibility is signifi-

cantly reduced. Where each defendant carries its burden of proof with respect to actual market share, no defendant will be held liable in negligence for more harm than it statistically could have caused in the relevant market. Furthermore, the opportunity to present exculpatory evidence reduces the risk of imposing liability on innocent actors. It is conceded that in some situations a defendant will be held liable to a particular plaintiff whose injury it did not actually cause. However, under a market-share theory, a plaintiff must first prove that a defendant acted tortiously before any liability may be imposed. Consequently, a defendant who erroneously is held liable to a particular plaintiff can not be considered wholly innocent of wrongdoing. Such defendant, by engaging in the conduct found to be negligent, contributed to the risk of injury to the public in general and consequently shares some degree of culpability in producing or marketing DES.

Defendants also object to the allocation of the burdens of proof as inequitable and impractical, arguing that plaintiffs, rather than defendant drug companies, have superior access to identification information and that, therefore, defendants should not have the burden of exculpating themselves. This argument, however, proves too much. The fundamental premise of the market-share theory of liability is that the plaintiff lacks sufficient identification information to make out a prima facie case of negligence under traditional principles of tort liability. The absence of such information is largely attributable to the substantial delay in the drug's effects and the consequent loss of evidence, and the generic marketing methods employed by drug companies to promote and distribute DES. Furthermore, any evidence the plaintiff might possess or have access to concerning the type of DES taken by her mother, the

---

**4.** Assume hypothetically, five *prima facie* defendants, of whom one shows an actual share of 12%. The four remaining defendants will each be potentially liable for 22%. Suppose, instead, that one shows an actual share of 12% and a second of 13%—the three remaining defendants will then each be potentially liable for 25%.

**5.** Assume hypothetically, five *prima facie* defendants who show that their actual shares are, respectively, 5%, 10%, 15%, 20% and 25%. Plaintiff could recover a maximum of 75% of her damages.

relevant time period, and the place of ingestion is readily obtainable under modern discovery procedures. This is particularly true in the instant case where the defendants have the resources and investigative personnel to pursue all discovery devices. Defendants maintain that the market-share theory of liability will encourage manufacturers who have difficulty proving market share, to implead all other manufacturers since additional defendants will reduce the size of the pro rata share. The experience of courts in other DES cases, however, belies defendants' apprehension. In fact, the *Payton* court observed, "in the typical situation, the inquiry narrows down to one or two drug stores and pills that are differentiated in size, shape and color." Certainly, such evidence is sufficiently specific to enable the majority of DES manufacturers to extricate themselves from the case at the very outset. It would make little sense, then, for a defendant to randomly implead other manufacturers.

Defendants further contend that adoption of a market-share theory of liability by this court would run counter to the important public policy favoring the development and marketing of new drugs cited by the Massachusetts Supreme Judicial Court in *Payton.* The court disagrees. Imposition of market-share liability for defects or inadequate testing or warnings will likely provide an incentive to product safety. *See,* e.g., *Cronin v. J.B.E. Olson Corp.,* 1972, 8 Cal.3d 121, 129, 104 Cal.Rptr. 433, 501 P.2d 1153; Rest.2d Torts, § 402A, Comment C, pp. 349–50 (1965). In addition, the market-share theory would encourage manufacturers to either make their products identifiable or to improve their recordkeeping procedures when marketing generic products, in order to avoid market-share liability in the future. Comment, "DES and a Proposed Theory of Enterprise Liability," 46 Fordham L.Rev. 963, 975–978 (1978). These considerations are particularly significant where medication is involved. The consumer is virtually helpless to protect herself from serious, sometimes permanent injuries caused by defective drugs.

■ Finally, defendants urge the court to require DES plaintiffs to make a showing of "due diligence" before they may employ a market-share theory of liability. Specifically, defendants argue that plaintiff should be required to allege that she has made a good faith effort to identify the particular manufacturer of the DES which caused her injuries, and that, through no fault of her own, she has been unable to do so. This requirement appears to have originated in *Abel v. Eli Lilly & Co.,* 1984, 418 Mich. 311, 343 N.W.2d 164, 173. Defendants contend that without such a requirement, a plaintiff can employ a market-share theory of liability when she discovers that the actual manufacturer is either no longer solvent or in existence.

· After carefully considering the effectiveness of a due diligence requirement as a safeguard against abuse by plaintiffs of the market-share theory of liability, the court is persuaded that countervailing considerations mandate . rejection of the requirement. First, as noted *ante,* any identification information in plaintiff's possession will be available to defendants through discovery. Defendants argue that initially the plaintiff, rather than defendants, will have access to specific information regarding any DES ingested by her mother. Hence, it is argued, plaintiff should be required to show that she has not contributed to the lack of identification evidence by failing to investigate the facts or delaying the filing of her claim. But this argument ignores the fact that identification evidence, under any theory of liability, facilitates the plaintiff's proof of her claim as much as it does the defendants' proof of a defense. Plaintiffs have little incentive to conceal identification information. To the extent that they can identify a particular manufacturer, they can employ traditional principles of tort liability which provide, upon proof of the claim, for a 100% recovery of the judgment, as well as a simpler, less conjectural remedy probably more appealing to the average juror. In contrast, market-share liability may result in plaintiffs' only recovering a portion of the judgment, thereby providing incentive to dis-

cover the identity of the actual manufacturer. While the court recognizes the potential for abuse, that is not a sufficiently compelling reason for wholesale adoption of a due diligence requirement. In the court's opinion, normal discovery procedures will prove effective, in most cases, in weeding out wholly unfounded claims.

Furthermore, several considerations strongly counsel against imposing on plaintiffs a requirement of alleging due diligence. First, there may be situations where a plaintiff, confronted with estrangement from her family or the death of her mother, will be unable to satisfy a court that she has genuinely attempted to locate the manufacturer. The due diligence requirement assumes a relationship of confidence between the plaintiff and her mother which may not exist in many cases. A plaintiff may be in no better position than a defendant to discover individualized identification evidence. While a court undertaking a due diligence inquiry would weigh such factors on a case-by-case basis, we decline to impose a requirement that would, in many situations lead to empty allegations by plaintiffs and time-consuming, often fruitless inquiries by courts.

Lastly, the due diligence requirement is fundamentally at odds with the concept of market-share liability. The market-share theory is premised on the inability of a plaintiff to identify the manufacturer that caused her injury. Requiring a plaintiff to allege and prove due diligence is, in essence, requiring her to explain what already can be presumed: the plaintiff has no cause of action under traditional standards of liability. Defendants assert that elimination of the requirement will encourage plaintiffs to delay prosecution of their claims until identification evidence is lost. However, the market-share theory relieves plaintiffs only of the burden of proving causation in fact. Thus, the evidence which defendants fear will be negligently lost or purposely concealed, will often be plaintiffs' only evidence of proximate cause and damage. Therefore, plaintiffs have as much incentive to protect such evidence as do defendants. In the court's view, relevant statutes of limitations can address

adequately the problem of unreasonable delay in the prosecution of claims. More importantly, however, the market-share theory adapts the rules of causation and liability to meet the changing needs of product liability litigation. It seems inappropriate, then, to require every plaintiff in every DES case, effectively to prove to the court that prior doctrine will not suffice to govern the obligations of manufacturer to consumer.

### D. *Defendants' Motion to Dismiss*:

In light of the court's examination of the essential elements of market-share liability and the applicable burdens of pleading and proof, it is apparent that plaintiff's second amended complaint states a valid cause of action. Accordingly, defendants' motion to dismiss plaintiff's market-share claim must be denied.

█ Plaintiff has alleged that her mother ingested DES during the pregnancy which resulted in plaintiff's birth; that plaintiff is suffering from vaginal adenosis; that the DES caused plaintiff's injury; that defendants produced or marketed the type of DES product taken by plaintiff's mother; and that defendants acted negligently in producing or marketing the drug. In addition, plaintiff's complaint contains allegations concerning the time of her mother's ingestion of the drug and the geographical boundaries of the relevant market. Such allegations support a market-share theory of recovery that, in this court's view, meets the concerns of the Massachusetts Supreme Judicial Court. Defendants' motion to dismiss is therefore denied.

## II. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants The Upjohn Company and Dart Industries, Inc. have moved for summary judgment against plaintiff. As grounds therefor, both defendants state that the undisputed facts demonstrate that neither of them manufactured or distributed the DES which caused plaintiff's injuries. The function of the court in deciding a motion for summary judgment is to de-

termine whether the moving party has met its burden of demonstrating that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. F.R.C.P. Rule 56(c). The court must look at the record in the light most favorable to the party opposing the motion. After hearing and consideration of the briefs, affidavits and exhibits submitted by the parties, the court grants the motions of these two defendants.

### A. *Upjohn Company's Motion*:

■ The uncontroverted testimony of plaintiff's mother, Mrs. Vendito, is that the DES she took during her pregnancy with plaintiff, was in the form of "little white pills" about the size of saccharin tablets, and "little orange or little red pills," "very small," with a hard, coated surface "like an M & M," but smaller in size. Plaintiff does not offer any evidence which would call the accuracy of Mrs. Vendito's descriptions into question. Furthermore, defendant has submitted the affidavit of Raymond H. Schoening, an employee of defendant, which states that "The Upjohn Company has never developed, manufactured, distributed, marketed, advertised, sold or resold," DES in any form other than a spherical, gelatinous perle filled with fluid.

Plaintiff, on the other hand, merely asserts that her mother's memory is vague and thus a genuine issue exists as to the physical characteristics of the DES she ingested. The only evidence plaintiff offers to controvert Schoenfield's affidavit that Upjohn only manufactured and sold DES in the form of oval-shaped, gelatinous perles is the bare assertion that his affidavit is conclusory and that defendant, instead of submitting the affidavit, "could have shown Mrs. Vendito a photographic array of pills or samples." Such assertions do not establish a genuine issue of material fact. On the contrary, the undisputed evidence here is precisely the kind of proof contemplated by the court as sufficiently exculpatory to exclude a defendant as a matter of law from liability under the market-share theory of recovery.

### B. *Dart Industries, Inc.'s Motion*:

■ Defendant, formerly known as Rexall Drug Company, in support of its motion for summary judgment, offers uncontroverted evidence that Mrs. Vendito's DES prescription was filled at only one drugstore, the Shirley Drugstore in Revere, Massachusetts, and the testimony of Samuel Harvey Kohn who worked part-time at the Shirley Drugstore from 1949 to 1953, and then became a pharmacist at the drugstore until 1959. Mr. Kohn testified in a deposition that he did not recall ever seeing a prescription that specified Rexall DES; that DES prescriptions were filled with brands other than Rexall; that the Shirley Drugstore could not purchase Rexall products from its wholesalers; that at no time during his employment at the drugstore was there a Rexall order book; and that the drugstore was not a Rexall store between 1953 and 1959. Kohn further testified that he did not think the drugstore carried any Rexall products during the relevant time period. In addition, defendant relies on the affidavits of Rexall's national counsel, Grashof, and Rexall's Sales Administrator, Secrist, who set forth Rexall's distribution limitations for all its products during the relevant time period. Specifically, the affiants state that Rexall sold its pharmaceutical products only to its licensed franchisees or company-owned stores. Rexall never sold its products nor offered free samples to any other party, including hospitals and physicians. Finally, Mr. Secrist states that Rexall, which maintains records of all accounts to which it has ever sold its pharmaceutical products, has reviewed such records and concluded that the Shirley Drugstore has never been able to purchase Rexall products.

Plaintiff, in opposition to the motion, argues that the testimony of Kohn is inconclusive and further, that defendant may not rely on records which it has not produced or made available to plaintiff. However, as far as the court can tell, plaintiff has made no attempt to discover the records on which the affidavits of defendant's employees are based. Nor has plaintiff offered any evidence which would cast

doubt on the accuracy of the records or the statements of the affiants. Furthermore, plaintiff has not made a sufficient showing with respect to the inconclusiveness of Kohn's testimony. A fair reading of the testimony reveals that as far as Kohn can recall, the Shirley Drugstore never sold or stocked Rexall DES. Plaintiff would have the court conclude that because Kohn can not state with absolute certainty that the drugstore never sold any Rexall DES, a genuine issue exists as to whether Rexall supplied the DES ingested by plaintiff's mother. However, plaintiff offers no other reason for questioning the credibility of Kohn or the two affiants.

Defendant further argues that the borrowing practices of the Shirley Drugstore also do not raise any genuine issue of material fact. Defendant relies on Kohn's deposition testimony that the only Rexall product he ever remembers borrowing or purchasing from another drugstore was a bottle of vitamins. Mr. Kohn stated that although it was possible that the Shirley Drugstore could have borrowed DES from another drugstore, he did not recall ever borrowing DES. Defendant also cites Judge Skinner's decision after decertification of the plaintiff class, in *Payton v. Abbott Labs et al.*, 76–1514–S, granting defendant's motion for summary judgment on March 1, 1984, in which the court addressed the issue of borrowing on a similar record, as follows:

> There is a possibility that on the particular occasion when plaintiff's mother bought her DES, the druggist was out of stock and chose to borrow some DES from this Rexall store. There is no evidence on this point. All that exists is a mere possibility. There is no basis of inferring a significant probability that such an event ever occurred. Accordingly, the statistical probability that is one of the underpinnings of the plaintiff's market-share theory is skewed to the point where it is no longer a rational basis for imposing liability on Rexall.

The court also notes that plaintiff does not even raise the issue of borrowing in her memorandum in opposition to defendant's motion. In the absence of affirmative evidence to the contrary, any issue as to the Shirley Drugstore's borrowing practices is far too speculative to amount to a genuine issue of a material fact.

Based on the uncontroverted facts in the record, the court holds that no genuine issue exists as to whether Rexall supplied the DES which caused plaintiff's injury and that defendant Dart Industries is entitled to a judgment as a matter of law. The market-share theory of liability herein espoused, while premised on the failure of evidence of causation in fact, does not preclude a defendant from disproving individual responsibility for plaintiff's injuries.