Monica SANTIAGO, Plaintiff,

v.

**SHERWIN–WILLIAMS COMPANY, et al., Defendants.**

Civ.A. No. 87–2799–T.

United States District Court, D. Massachusetts.

Jan. 13, 1992.

---

Neil T. Leifer, Stephen J. Kiely, Thornton & Early, Jonathan Shapiro, Stern & Shapiro, Boston, Mass., Judith E. Somberg, Johnson & Somberg, Jamaica Plain, Mass., Arthur Bryant, Washington, D.C., for plaintiff Monica Santiago.

Thomas J. Griffin, Jr., Goodwin, Proctor & Hoar, Boston, Mass., Paul Michael Pohl, Charles H. Moellenberg, Jones, Day, Reavis & Pogue, Pittsburg, Pa., for defendant Sherwin–Williams Co.

Peter S. Terris, Palmer & Dodge, Boston, Mass., Kirsten K. Robbins, Kirkland & Ellis, Washington, D.C., for defendant NL Industries, Inc.

Lawrence Gerard Cetrulo, Burns & Levinson, Boston, Mass., for defendant Eagle–Picher Industries, Inc.

Thomas V. Urmy, Jr., Shapiro, Grace & Haber, Boston, Mass., Janie S. Mayeron, G. Marc Whitehead (argued), Ellen Maas, Michael L. Nilan, Popham, Haik, Schnobrich & Kaufman, Minneapolis, Minn., for defendant SCM Corp.

Mary Morrissey Sullivan, Sullivan, Sullivan & Pinta, Boston, Mass., for defendant Lead Industries Ass'n.

Rory John Fitzpatrick, Rory Fitzpatrick, Meghan H. Magruder, John C. Solomon, Bingham, Dana & Gould, Boston, Mass., for defendant Atlantic Richfield Corp.

MEMORANDUM

TAURO, Chief Judge.

Plaintiff Monica Santiago [1] brought this action against several defendants [2] that manufactured lead pigment contained in lead-based paint, charging that their negligence caused her to become lead poisoned. Although the defendants used pigment themselves in their own paint, the gravamen of Santiago's complaint against them relates to their role as manufacturer of lead pigment and bulk supplier to other paint producers. The defendants were all members of defendant Lead Industries Association ("LIA"), a trade association.

Santiago was born on November 9, 1972. From her birth until 1978, she and her family lived in an apartment at 20 Liston Street in Dorchester, Massachusetts. She alleges that, during those years, she ingested lead from paint on the walls of the family's apartment. The walls contained multiple layers of paint, the first of which had been applied around the time the apartment house was built in 1917. In November 1973, Santiago was first diagnosed as having lead poisoning. She was hospitalized in July 1976, and underwent chelation therapy to remove lead from her body.

Santiago alleges that defendants, or their predecessors in interest, marketed all or virtually all of the lead used in lead-based paints sold in the United States between 1917 and 1972. Specifically, the complaint charges defendants with negligent product design, negligent failure to warn, breach of warranty, and concert of action. She maintains that defendants, by and through defendant LIA, "mislead retailers, users, applicators, and parents of young children ... with respect to the unreasonable risks and hazards posed to young children by the lead produced and marketed by them and by the paint containing such lead." Amended Compl. ¶ 26. She seeks $2.5 million in compensatory and punitive damages.

Presently at issue is the applicability of market share liability as a theory of recovery for Santiago, given the uncontradicted material facts involved in this case. Defendants move for partial summary judgment on the ground that she cannot identify which of them allegedly caused her harm. They contend that, in the absence of a market share liability theory, identification is essential to plaintiff's case. They further argue that market share liability is not the law in Massachusetts, and that the Supreme Judicial Court would not adopt market share in the context of the circumstances involved here. Santiago, in her motion for partial summary judgment, argues to the contrary.

I.

*Market Share Generally*

■ A threshold requirement in any products liability action is the identification of the injury-causing product and its manufacturer. *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 188 (1982). As a general rule, if the plaintiff cannot establish who or what caused her injury, summary judgment for the defendant is appropriate. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (summary judgment appropriate where plaintiff fails to present sufficient evidence to establish the existence of each element of her claim).

In exceptional circumstances, courts have relaxed the identification requirement, and permitted a plaintiff to shift the burden of establishing the cause of injury to clearly culpable defendants. *See Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948) (where two defendants negligently fired shots, only one of which hit plaintiff, burden shifts to defendants to prove lack of causation). The rationale behind this theory of alternative liability "is the injustice of

---

**1.** Until November 9, 1990, Monica's mother, Carmen Santiago, appeared on her behalf, because Monica was a minor.

**2.** Defendants include Sherwin–Williams Company, NL Industries, Inc., Eagle–Picher Industries, Inc., Atlantic Richfield Corp. (successor to Inter-

national Smelting & Refining Company), and SCM Corporation (successor to Glidden Company). On January 7, 1991, defendant Eagle–Picher filed for bankruptcy in Ohio, thus automatically staying this action against it. *See* 11 U.S.C. § 362.

permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." Restatement (Second) of Torts § 433B, comment f, p. 446.

Given the reality of mass production and complex marketing methods, courts have recognized the difficulty a products liability plaintiff faces in identifying the manufacturer that caused the alleged harm. "[A]dvances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer." *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 144, 607 P.2d 924, 936, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). Courts from various jurisdictions, therefore, have relied upon the concept of alternative liability "to aid plaintiffs in overcoming an inability to prove causation in products liability." *Starling v. Seaboard C.L.R. Co.*, 533 F.Supp. 183, 187 (S.D.Ga. 1982).

In *Sindell*, the California Supreme Court pioneered a derivative of alternative liability, known as market share theory. In that case, the daughters of women who had ingested the drug DES during pregnancy brought a class action against manufacturers that had produced a "substantial share" of DES during the relevant time period. They alleged that their exposure to DES *in utero* caused a rare form of cancer, and that the defendants were negligent in failing to adequately test the drug or warn of its potential hazards. The plaintiffs could not, however, identify which particular DES manufacturer had supplied the pills that caused their injury.

Recognizing that traditional tort principles would foreclose the plaintiffs from recovering, the court nonetheless held that public policy reasons supported allowing the suit. 163 Cal.Rptr. at 144, 607 P.2d at 936. *See also Starling*, 533 F.Supp. at 187

("Market share liability ... eliminates proof of causation strictly for public policy reasons."). The court stated that

as between an innocent plaintiff and negligent defendants, the latter should bear the cost of injury. Here, as in *Summers*, plaintiff is not at fault in failing to provide evidence of causation, and although the absence of such evidence is not attributable to the defendants either, their conduct in marketing a drug the effects of which are delayed for many years played a significant role in creating the unavailability of proof.

*Sindell*, 163 Cal.Rptr. at 144, 607 P.2d at 936. *See also McCormack v. Abbott Laboratories*, 617 F.Supp. 1521, 1524 (D.Mass. 1985) (Market share liability is justified because "all defendants contributed to the risk of injury to the public, and consequently, the risk of injury to the individual plaintiffs.").

The *Sindell* court refused to base the defendants' liability directly on *Summers*, because the plaintiffs had failed to join all the parties that could have been responsible for causing their harm. 163 Cal.Rptr. at 139, 607 P.2d at 931. The court estimated that two hundred manufacturers had produced DES, while the plaintiff named only five manufacturers as defendants. 163 Cal.Rptr. at 147, 607 P.2d at 939 (Richardson, J., dissenting). Finding "forceful arguments in favor of holding that plaintiff has a cause of action,"[3] the court created market share liability, which reflects a "modification of the rule of *Summers*." 163 Cal.Rptr. at 144, 607 P.2d at 936.

As a further variation on *Summers*, the court also declined to impose joint and several liability in *Sindell*. It reasoned that, in view of the large number of manufacturers, there may be a substantial likelihood that none of the named defendants actually supplied the drug which caused plaintiffs' harm. *Sindell*, 163 Cal.Rptr. at 144–45, 607 P.2d at 936–37. In the interest of fairness, therefore, it decided that each defendant would be liable only for "the pro-

---

**3.** The court found significant that the defendant manufacturers had produced DES from an identical formula, which contributed to plaintiff's inability to identify the wrongdoer. 163 Cal. Rptr. at 144, 607 P.2d at 936.

portion of the judgment represented by its share of the market." 163 Cal.Rptr. at 145, 607 P.2d at 937. The rationale supporting the market share concept was that, assuming identification could have been made in 100 cases, a defendant having twenty percent of the market would have been 100 percent liable in twenty cases. Market share would reach the same essential result by holding that particular defendant twenty percent liable in 100 percent of the cases. *See Sindell,* 163 Cal.Rptr. at 145 & n. 28, 607 P.2d at 937 & n. 28.

▆▆▆ Market share theory, therefore, permits a plaintiff to bypass the traditional threshold requirement of identifying the defendant that caused the alleged harm. *McCormack,* 617 F.Supp. at 1524. In general,[4] a plaintiff "need only allege inability to identify the actual manufacturer, and join as defendants those manufacturers that compose a 'substantial share' of the market."[5] *Hannon v. Waterman S.S. Corp.,* 567 F.Supp. 90, 91 n. 1 (E.D.La.1983) (quoting Note, "Market Share Liability for Defective Products: An Ill-Advised Reme-

dy for the Problem of Identification," 76 Nw.U.L.Rev. 300, 301 (1981)). Once a plaintiff establishes negligence, the burden of exculpation shifts to the defendants. *See Sindell,* 163 Cal.Rptr. at 144–45, 607 P.2d at 936–937. For those defendants ultimately found liable, the court will apportion damages based on each defendant's share of the product market. *McCormack,* 617 F.Supp. at 1525. Under market share theory, therefore, "a particular defendant's potential liability is proportional to the probability that it caused plaintiff's injury." *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368, 382 (1984). *See also McCormack,* 617 F.Supp. at 1526 ("Theoretically, then, the extent of a defendant's liability approximates the amount of harm such defendant has caused in the market.").

The courts that have accepted market share liability have generally done so in the context of DES cases.[6] But other courts have rejected it in both DES and non-DES situations.[7]

---

**4.** There are several variations of market share theory. For example, *Sindell* requires the plaintiff to join a substantial share of the manufacturers that produced the defective product. 163 Cal.Rptr. at 145, 607 P.2d at 937. By contrast, under *Martin v. Abbott Laboratories,* 102 Wash.2d 581, 689 P.2d 368, 382 (1984), a plaintiff need only sue one manufacturer of the defective product. That defendant can produce evidence of its market share, and then be liable only to that degree. In other words, if this defendant shows that it occupied only 20% of the market, it will be liable for 20% of the judgment. 689 P.2d at 382. Under *Sindell,* the named defendants, constituting a substantial share of the manufacturers that produced the drug, will be liable for 100% of the judgment, even if, together, they actually had less than 100% of the market.

**5.** In *Sindell,* for example, the plaintiff joined as defendants manufacturers who, together, had a 90% market share. 163 Cal.Rptr. at 145, 607 P.2d at 937.

**6.** *See e.g., McCormack v. Abbott Laboratories,* 617 F.Supp. 1521 (D.Mass.1985); *McElhaney v. Eli Lilly & Co.,* 564 F.Supp. 265 (D.S.D.1983); *Conley v. Boyle Drug Co.,* 570 So.2d 275 (Fla. 1990); *Hymowitz v. Eli Lilly & Co.,* 73 N.Y.2d 487, 539 N.E.2d 1069, 541 N.Y.S.2d 941, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *Martin v. Abbott Laboratories,* 102

Wash.2d 581, 689 P.2d 368 (1984); and *Collins v. Eli Lilly Co.,* 116 Wis.2d 166, 342 N.W.2d 37, *cert. denied,* 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). *See also Smith v. Cutter Biological, Inc., Div. of Miles, Inc.,* 823 P.2d 717 (Haw.1991) (product contaminated with HIV virus); *Ray v. Cutter Laboratories, Div. of Miles, Inc.,* 754 F.Supp. 193 (M.D.Fla.1991) (same); *Morris v. Parke, Davis & Co.,* 667 F.Supp. 1332 (C.D.Cal.1987) (vaccine).

**7.** *See e.g., White v. Celotex Corp.,* 907 F.2d 104 (9th Cir.1990) (asbestos); *Tidler v. Eli Lilly and Co.,* 851 F.2d 418 (D.C.Cir.1988) (DES); *Bateman v. Johns–Manville Sales Corp.,* 781 F.2d 1132 (5th Cir.1986) (asbestos); *Blackston v. Shook & Fletcher Insulation Co.,* 764 F.2d 1480 (11th Cir.1985) (asbestos); *Thompson v. Johns–Manville Sales Corp.,* 714 F.2d 581 (5th Cir.1983) *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984) (asbestos); *Benshoof v. National Gypsum Co.,* 761 F.Supp. 677 (D.Ariz. 1991) (asbestos); *University System of New Hampshire v. United States Gypsum Co.,* 756 F.Supp. 640 (D.N.H.1991) (asbestos); *McClelland v. Goodyear Tire & Rubber Co.,* 735 F.Supp. 172 (D.Md.1990), *aff'd without op. sub nom. Barger v. Goodyear Tire & Rubber Co.,* 929 F.2d 691 (4th Cir.1991) (toxic chemicals); *Lee v. Baxter Healthcare Corp.,* 721 F.Supp. 89 (D.Md. 1989), *aff'd without op.,* 898 F.2d 146 (4th Cir. 1990) (breast implant); *Poole v. Alpha Therapeutic Corp.,* 696 F.Supp. 351 (N.D.Ill.1988)

The application of market share liability to childhood lead poisoning is a matter of first impression.

## II.

### Market Share in Massachusetts

■ In diversity jurisdiction, such as here, the federal court must apply the law of the forum in which it sits. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Cantwell v. University of Massachusetts*, 551 F.2d 879, 880 (1st Cir.1977). The Supreme Court has made clear that "[a] federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits." *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975). As the First Circuit has stated:

> In diversity jurisdiction, "[o]ur function is not to formulate a tenet which we, as free agents, might think wise, but to ascertain, as best we can, the rule that the state's highest tribunal would likely follow."

*Porter v. Nutter*, 913 F.2d 37, 41 (1st Cir. 1990) (quoting *Kathios v. General Motors Corp.*, 862 F.2d 944, 949 (1st Cir.1988)). This court, therefore, must look to Supreme Judicial Court ("SJC") precedent to ascertain how it would likely resolve the issues involved in this case.

In answering certified questions, the SJC refused to adopt market share liability in the context of a DES case. *See Payton v. Abbott Laboratories*, 386 Mass. 540, 437 N.E.2d 171, 188 (1982). The court noted that the requirement of identifying the manufacturer and its injury-causing product serves two purposes: "it separates wrongdoers from innocent actors, and also ensures that wrongdoers are held liable only for the harm that they have caused." 437 N.E.2d at 188. On the facts of *Payton*, the SJC refused to allow recovery, because "the plaintiffs' market share theory fail[ed] adequately to protect either of the interests served by the identification requirement." *Id.* Under the plaintiffs' theory, defendants would not have been permitted to present exculpating proof. *Id.* at 189. Furthermore, if plaintiffs were successful in proving negligence, their theory would hold the six named defendants 100 percent liable, even though other DES manufacturers may have been negligent toward the plaintiff. *Id.* at 188.

In dicta, the SJC indicated that it might consider applying the market share theory in an appropriate DES case. The court stated that it did not intend to foreclose

> some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant period of time.

*Payton*, 437 N.E.2d at 190.

In *McCormack v. Abbott Laboratories*, 617 F.Supp. 1521 (D.Mass.1985), Judge

---

(AIDS virus); *Dawson v. Bristol Laboratories*, 658 F.Supp. 1036 (W.D.Ky.1987) (tetracycline); *Marshall v. Celotex Corp.*, 651 F.Supp. 389 (E.D.Mich.1987) (asbestos); *Griffin v. Tenneco Resins, Inc.*, 648 F.Supp. 964 (W.D.N.C.1986) (benzidine); *Vigiolto v. Johns–Manville Corp.*, 643 F.Supp. 1454, 1460 (W.D.Pa.1986) (asbestos); *Hannon v. Waterman S.S. Corp.*, 567 F.Supp. 90 (E.D.La.1983) (asbestos); *In re Related Asbestos Cases*, 543 F.Supp. 1152 (N.D.Cal. 1982) (asbestos); *Morton v. Abbott Laboratories*, 538 F.Supp. 593 (M.D.Fla.1982) (DES); *Starling, supra* (asbestos); *Prelick v. Johns–Manville Corp.*, 531 F.Supp. 96 (W.D.Pa.1982) (asbestos); *Mizell v. Eli Lilly & Co.*, 526 F.Supp. 589 (D.S.C.

1981) (DES); *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (D.S.C.1981) (DES); *Shackil v. Lederle Laboratories, Div. of American Cyanamid Co.*, 116 N.J. 155, 561 A.2d 511 (1989) (vaccine); *Gaulding v. Celotex Corp.*, 748 S.W.2d 627 (Tex.Ct.App.1988), *aff'd*, 772 S.W.2d 66 (Tex. 1989); *Goldman v. Johns–Manville Sales Corp.*, 33 Ohio St.3d 40, 514 N.E.2d 691 (1987) (asbestos); *Case v. Fibreboard Corp.*, 743 P.2d 1062 (Okl.1987) (asbestos); *Tirey v. Firestone Tire & Rubber Co.*, 33 Ohio Misc.2d 50, 513 N.E.2d 825 (1986) (tire rim); *Cummins v. Firestone Tire & Rubber Co.*, 344 Pa.Super. 9, 495 A.2d 963 (1985) (tire rim assembly); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo.1984) (DES).

Garrity relied on that dicta in allowing DES plaintiffs before him to use a market share theory "consistent with the guidelines articulated by the Massachusetts [SJC] in *Payton*." *Id.* at 1526.[8] Specifically, the *McCormack* court created a market share theory that permitted the defendants to produce exculpating evidence, *id.*, and which made each defendant liable only for that portion of the market it occupied during the relevant time period. *Id.* at 1527.[9]

Clearly, market share liability has some viability in Massachusetts.[10] But, further analysis is necessary to determine whether the SJC would permit the application of market share liability under the circumstances of this case.

### III.

### *Applicability of Market Share to Santiago's Claim*

Massachusetts' courts would accept the market share theory here if the defendants would be "held liable only for the harm that they have caused." *Payton*, 437 N.E.2d at 188. Defendants argue that, because of the nature of lead poisoning, and the variety of its possible causes, such certainty is impossible to achieve. To support this contention, defendants point out that in the DES cases, there is a unique, so-called "signature" injury, from a product manufactured, marketed and controlled by identifiable parties. Defendants maintain that no such certainty is present here, and

that a jury, therefore, would have to resort to speculation and guesswork in assigning liability. Each of these factors merits discussion.

### A. *Absence of a Unique Injury*

In DES cases, the market share theory succeeded in separating wrongdoers from innocent actors, because DES plaintiffs suffered from a signature DES injury—a rare form of cancer, adenocarcinoma, that was directly attributable to exposure to DES. *See* Nancy Lee Firak, *The Developing Policy Characteristics of Cause-in-Fact: Alternative Forms of Liability, Epidemiological Proof and Trans–Scientific Issues*, 63 Temp.L.Rev. 311, 334 (1990) ("In the DES cases there is no doubt that DES, and not a background risk, caused plaintiff's injury."). In contrast, defendants here assert that hereditary, social and environmental factors, or lead in other products, could have caused, or at least contributed to, Santiago's injuries. In other words, defendants argue that Santiago does not suffer from a signature lead paint injury.

Santiago claims that lead poisoning retarded her "educational, social, vocational and intellectual development." Amended Compl. ¶ 14. Plaintiff's injury is manifested by "difficulties in spelling/language arts, in organization, in requiring extra time and effort to check her work, and with frustration in learning to type." Affidavit of Sandra J. Shaheen, Ph.D. dated May 5,

---

**8.** Judge Garrity modeled his version of market share theory after the one espoused by the Washington Supreme Court in *Martin v. Abbott Laboratories*, 102 Wash.2d 581, 689 P.2d 368 (1984).

**9.** The *McCormack* court explained that, initially, the named defendants are presumed to have equal shares of the market. The defendants may rebut this presumption, however,

> by establishing by a preponderance of the evidence their individual market share of DES in the plaintiff's particular geographic market during the time period in question. Upon proof of an actual market share, a defendant will only be liable for the portion of the total judgment represented by such share. Of course, other defendants who fail to prove an actual market share will be liable equally for the remaining market. On the other hand,

> where all defendants successfully establish a reduced actual market share, the portion of the judgment representing the remaining unclaimed share of the market may not be recovered by the plaintiff.

*Id.* (footnotes omitted).

**10.** In *Commonwealth of Massachusetts v. Owens–Corning Fiberglass Corp.*, Nos. 90–37391, 90–3845, slip op. (Mass.App.Ct. August 23, 1991) the court held, in denying a motion to dismiss, that the plaintiffs could use market share theory to recover the costs of asbestos abatement from defendant asbestos manufacturers. There, however, the issues of causation and damages were clear because plaintiffs sought to recover only their costs of removing asbestos-containing materials. The court emphasized that "Plaintiffs do not seek indemnity for any personal injury caused to third parties." *Id.* at 1.

1991 ¶ 5. Defendants counter that none of the deficits associated with Santiago "can ever be attributed solely or primarily to lead," Affidavit of William Banner, Jr., M.D., Ph.D. dated June 10, 1991 ¶ 3, and that such "injuries" have been "strongly associated in the vast literature on childhood development with a large variety of factors including heredity, child-rearing techniques, mental and physical health of the parents, and other factors in the social and educational setting in which children develop." *Id.* Santiago's own expert estimates that some of the deficits that she exhibits are attributable to factors other than lead poisoning. Affidavit of John Graef, M.D. dated May 15, 1991 at 6.

Moreover, even if all of Santiago's injuries could be attributed to lead poisoning, she cannot prove that defendants' lead pigment was the cause of her lead poisoning. Defendants have shown that lead is widespread in many different forms, Affidavit of James Burrows dated June 10, 1991 ¶¶ 11–12, and that more than 90 percent of lead used in this country during the relevant period was contained in products other than paint. *Id.* ¶ 12. They further show that the air and water in and around Santiago's home during the relevant period may have contained lead that contributed to her blood levels. Affidavit of Dr. Bobby Wixson dated June 7, 1991 ¶¶ 11–13.[11] In addition, the City of Boston identified Santiago's neighborhood in Dorchester as a "hot spot" in soil lead contamination requiring attention by the Environmental Protection Agency. *Id.* ¶¶ 23–25. Defendants' expert asserts, as well, that vehicular traffic is a major source of elevated soil lead levels. *Id.* ¶ 20.

Summary judgment for defendant is appropriate where a plaintiff cannot show "that there [i]s a greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause." *Lynch v. Merrell–National Laboratories, Div. of Richardson–Merrell, Inc.*, 830 F.2d 1190, 1197 (1st Cir.1987) (citation omitted).

The "mere possibility" that plaintiff may have been injured by defendant's product "is not enough." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 41, at 269 (5th ed. 1984). Evidence must exist "from which the jury may conclude that · it is more probable than not" that defendant's product caused the injury. *Ryan*, 514 F.Supp. at 1008 (citation omitted). *See also Garside v. Osco Drug, Inc.*, No. 88–974, slip op. at 4 (D.Mass. Jan. 31, 1989) ("If there is more than one entity that might have caused plaintiff's harm, plaintiff must establish that the defendant was in fact the tortfeasor."), *aff'd*, 895 F.2d 46 (1st Cir.1990).

■ The public policy reasons favoring the use of market share do not control where there is a possibility that the defendants did not cause the harm in question. In deciding not to apply market share liability in an asbestos injury case, the court in *Case v. Fibreboard Corp.*, 743 P.2d 1062 (Okl.1987), stated that

[b]ecause market share liability theory is a theory which eliminates proof of causation of injury for public policy reasons, it must also be clearly founded in facts which support the link between the injury suffered and the risk to which plaintiff was exposed. In the DES arena this cause and effect was clear cut. In the application to asbestos related injuries there are more complications.

*Id.* at 1066 (footnotes omitted); *see also Starling*, 533 F.Supp. at 191 (refusing to apply market share in an asbestos case because "[t]he injuries caused by asbestos exposure are not restricted to asbestos products—other products, such as cigarettes, may have caused or contributed to the injury").

■ Defendants have produced evidence to show that factors other than lead pigment in paint were adequate producing causes of Santiago's injuries. The jury in this case, therefore, could only speculate as to the degree to which, if at all, the defendants' conduct caused her harm. *See Tidler*, 851 F.2d at 425.

---

**11.** For example, Dr. Wixson states that many older homes have lead water pipes, and that the lead pipes in plaintiff's apartment were not removed until 1975. *Id.* ¶ 13.

### B. *Defendants' Market Share*

 Market share liability holds defendants responsible only to the extent that their product has contributed to the risk of injury to the public. *See McCormack*, 617 F.Supp. at 1525. Presumably, defendants can calculate this risk by determining the percentage of the market that their product occupied during the relevant period.[12] If factors significantly skewing this calculation exist, then Massachusetts would not apply market share, because of the danger that defendants could be held liable for harm "exceeding their responsibility." *Payton*, 437 N.E.2d at 189.

Here, defendants argue that two factors make it impossible for them to determine the contribution each defendant made to the risk of harm. For one, they contend that the period in which plaintiff seeks to hold defendants liable spans fifty-four years, during which time the defendants moved in and out of the market. Second, defendants point out that Santiago seeks to hold them liable as bulk suppliers of lead pigment, not as paint manufacturers. As such, defendants argue that they are even further removed from any injury to Santiago because they did not package or market the allegedly offending paint. The court considers these arguments *seriatim*.

#### 1. scope of the market

 In *Payton*, the SJC indicated that, in order to hold defendants liable, each had to have been "actively in the DES market during all or a substantial part of the relevant period of time in which the mothers of the plaintiffs ingested DES." 437 N.E.2d at 188. There, the market was limited to the year in which the named plaintiff's mother ingested DES. Here, the market spans five decades. Santiago contends that the house was first painted around 1917, and that the walls inside the house contain five layers of paint, with the last layer having been applied between 1955 and 1969.

Defendants show that, by 1954, three of the five defendants had ceased producing white lead pigments. Affidavit of John Smith dated May 15, 1991 at 11. In addition, defendant Glidden did not begin producing white lead pigment until 1924, and it stopped in the late 1950's. *Id.* Defendant Sherwin–Williams has shown, moreover, that by the mid–1930's its lead pigment was used primarily for commercial and industrial applications. Hausmann Affidavit dated June 3, 1991 ¶ 14 at 8 n. 5. Finally, defendants contend that, given the fifty-four year window here, there is insufficient data to establish to what degree each defendant's product was used in lead-based paint.[13]

Courts adjudicating asbestos cases have refused to apply market share, because of the difficulty of defining a market over a period of years. In *In re Related Asbestos Cases*, the court stated that "a factor contributing to the difficulty in calculating market shares is the fact that some plaintiffs were exposed to asbestos over a period of many years, during which time some defendants began or discontinued making asbestos products." 543 F.Supp. at 1158. Similarly, in *Starling*, an asbestos case, the court refused to apply market share because of the difficulty in calculating the risk associated with the defendants' product. 533 F.Supp. at 191.

This court concludes that there is insufficient evidence that would warrant a jury in finding that all the defendants, or any of them, actively participated in the lead pigment market for lead based paint during the fifty-four year period involved here.

#### 2. defendants as bulk supplier

 Of particular significance as well is the fact that defendants here supplied lead

---

**12.** The *Sindell* court acknowledged that a defendant's market share cannot be determined with "mathematical exactitude." It nonetheless held that "the difficulty of apportioning damages among the defendant producers in exact relation to their market share does not seriously militate against the rule we adopt." 163 Cal. Rptr. at 145, 607 P.2d at 937.

**13.** Plaintiff relies heavily on data compiled by the U.S. government for a Federal Trade Commission proceeding reviewing the five defendant manufacturers' monopolistic behavior in the sale of white lead carbonate. This information, however, covers only four years—from 1938 to 1941—out of the fifty-four for which plaintiff seeks to hold defendants liable.

pigment in bulk to paint manufacturers. They are not being sued as manufacturers or marketers of the allegedly offending paint. They, therefore, could not control all of the risks that their products may have presented to the public.

Santiago acknowledges that the paint manufacturers, not these defendants, were the ones that decided what amount of lead pigment to use, and whether to use any lead pigment at all. *See* Pl.'s Supplemental Resp. to Def. SW's Second Set of Req. for Admissions Nos. 79–81 ("Pl.'s Supp. Resp."). Santiago further admits that the paint manufacturers knew the hazards associated with lead paint, *see* Pl.'s Resp. to Def.s' Req. for Admissions No. 82, and that they controlled the packaging of the paint and the warnings placed thereon. Pl.'s Supp. Resp.

No court has applied market share theory to a defendant that supplies an ingredient for a product packaged and sold by others. *See e.g., Tidler v. Eli Lilly & Co.,* 851 F.2d 418, 425 (D.C.Cir.1988); *George v. Parke–Davis,* 107 Wash.2d 584, 733 P.2d 507, 515 (1987); *Lyons v. Premo Pharmaceutical Labs, Inc.,* 170 N.J.Super. 183, 406 A.2d 185, 191–92, *certif. denied,* 82 N.J. 267, 412 A.2d 774 (1979). The facts of this case do not warrant a different result.

### Conclusion

For all the reasons discussed above, this court determines that it would be inappropriate to permit Santiago to proceed under a market share theory of liability. Defendants' Motion for Summary Judgment to preclude Santiago from utilizing market share liability theory is ALLOWED. Santiago's Motion to the contrary is, therefore, DENIED.